Tracy **BUSH**, Appellant,

v.

**Michael Wayne BUSH**, Appellee.

No. 01–08–00972–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Dec. 31, 2010.

727

Charley L. Smith, The Law Office of Charley L. Smith, Bellville, for Appellant.

Jeffrey R. Matthews, Matthews & Easley, P.C., Houston, for Appellee.

Panel consists of Justices KEYES, HIGLEY, and BLAND.

## OPINION

LAURA C. HIGLEY, Justice.

Appellant, Tracy Bush, appeals from a decree of divorce dissolving the marriage between appellee, Michael Wayne Bush, and herself and appointing the parties joint managing conservators of their daughter, C.B.

In six points of error, Tracy argues that the trial court erred in (1) appointing an amicus attorney in a limited role; (2) awarding the parents a joint managing conservatorship over their daughter and determining that Michael should have the right to designate the child's domicile; (3) dividing the community estate unequally; and (4) determining that certain horses were Michael's separate property.

We affirm.

## Background

Both Tracy and Michael had children from previous marriages. Tracy had a daughter, and Michael had two sons. They married in November 1999 and subsequently had another child, C.B.

Before their separation, allegations arose that Tracy was having an affair. Closer to the time of the separation, J.S., Tracy's daughter from her previous marriage, claimed that Michael had sexually assaulted her. Tracy and Michael separated in May 2006, and Tracy filed for divorce in October 2006.

Agreed temporary orders were entered shortly after the suit was filed that, among other things, gave Tracy temporary custody of C.B. and ordered that Michael's visitations with C.B. had to be supervised by another adult. Subsequently, an issue was raised as to whether Michael's visitations with C.B. were being properly supervised. The trial court decided it would be best to have an amicus attorney appointed to interview the child and others, to make this assessment, and "to make sure the child is safe." An amicus was appointed and participated in a limited role in the remainder of the case.

At trial, both parties sought to be appointed the sole managing conservator of C.B. Additionally, the parties could not reach an agreement on the characterization of the property of the marriage and how it should be divided. The parties presented testimony and other evidence regarding the character of various assets and how they should be divided. The disputed issues included how a tax obligation incurred in Michael's separate property

business should be apportioned and whether certain horses were community property or Michael's separate property.

Ultimately, the trial court determined that Tracy had engaged in an affair during the marriage; that the evidence did not support a finding that Michael had sexually assaulted J.S.; that the parents should be appointed as joint managing conservators of C.B.; that Michael should have the right to designate C.B.'s domicile; that the tax obligation was a community obligation; and that the horses in question were Michael's separate property. Tracy appealed.

### Appointment of Amicus

◼ In her first point of error, Tracy argues that the trial court "erred in appointing an amicus attorney in a limited role." This issue, however, has not been preserved for appeal.

On March 1, 2007, an issue was presented to the trial court as to whether Michael's visitations with C.B. were being properly supervised. The trial court decided it would be best to have an amicus attorney appointed to interview the child and others, to make this assessment, and "to make sure the child is safe." The parties agreed without any objections other than questions of whether the parties could afford the amicus attorney.

The amicus attorney interviewed the child, the parents, Michael's mother, and a neighbor. She also participated in the trial, cross-examining witnesses on topics relevant to the stated scope of her responsibilities. During her closing argument, on May 9, 2008, the amicus attorney restated her understanding of the scope of her responsibilities. She stated, "I was brought into this case to determine whether or not I thought [Michael]'s periods of possession or access to the child should be supervised. And that's what I'm going to address to the Court." The trial court invited her to express any opinion she had "in regard to the child, not necessarily limited to just visitation." The trial court did not otherwise contradict the scope of the amicus attorney's stated scope of responsibilities. None of the parties contradicted this scope of responsibilities or objected to its limitations.

Over three months later, in her Response to Motion to Sign Decree of Divorce, Tracy argued (1) that the proposed decree failed to identify the limited scope in which the amicus attorney had functioned and (2) that the amicus attorney:

> believed she was appointed with only a limited function and did not participate in a manner that represented the interest of the child outside of the specific issues she was assigned to investigate. Petitioner requests that Jan Allen be recognized and allowed to participate in a more complete capacity and be allowed to make a recommendation to the court regarding the best interest of the child.

At the hearing, however, Tracy abandoned her second argument and only argued that the divorce decree should reflect the fact that the amicus attorney was appointed with a limited scope of responsibilities. Once again the amicus attorney stated the limited scope of the responsibilities she had undertaken. The trial court agreed to change the language of the decree and no other issue related to the amicus attorney was raised.

In her motion for new trial, filed on September 25, 2008, Tracy argued that a new trial should be granted "because the attorney appointed to represent the interest of the child believed her role in the case was of a limited nature .... [and] limited her function to one issue and did not participate fully as a representative of the child." This argument does not chal-

lenge the trial court's limitations on the amicus attorney's scope of responsibilities. Instead it suggests that the amicus attorney was incorrect in believing that her responsibilities had been limited in scope.

To present a complaint for appellate review, the record must show (1) the complaint was presented to the trial court by a timely request, objection, or motion stating the specific grounds for the desired ruling if the specific grounds are not apparent from the context and (2) the trial court ruled on the request. TEX.R.APP. P. 33.1(a); *C & K Investments v. Fiesta Group, Inc.*, 248 S.W.3d 234, 255 (Tex. App.-Houston [1st Dist.] 2007, no pet.). Even if we were to take Tracy's argument in her motion for new trial as an objection to the trial court's appointment of the amicus attorney in a limited scope, this objection came over a year and a half after the trial court appointed the amicus attorney with those limitations specifically stated without any objection. In that year and a half, the amicus attorney restated her understanding of the scope of her responsibilities and no objection was ever raised. Tracy requested, in a response to a motion filed a month before her motion for new trial, that the amicus attorney's responsibilities be expanded, but abandoned that argument in the hearing. We hold that this issue has not been properly preserved for appeal.

We overrule Tracy's first point of error.

## Conservatorship of the Child

In her second, third, and fourth points of error, Tracy attacks certain findings of fact and conclusions of law that resulted in the trial court determining that Michael and Tracy should be given joint managing conservatorship of their child with Michael being given the right to designate the residence of the child.

## A. Standard of Review & Applicable Law

We review a trial court's decision on conservatorship for an abuse of discretion and reverse the trial court only if we determine, from reviewing the record as a whole, that the trial court abused its discretion. *Monroe v. Alternatives in Motion*, 234 S.W.3d 56, 64 (Tex.App.-Houston [1st Dist.] 2007, no pet.). A trial court abuses its discretion when it acts arbitrarily or unreasonably, or without reference to any guiding rules or principles. *Id.* at 64–65. We view the evidence in the light most favorable to the trial court's decision and indulge every legal presumption in favor of its judgment. *Holley v. Holley*, 864 S.W.2d 703, 706 (Tex.App.-Houston [1st Dist.] 1993, writ denied).

Under an abuse of discretion standard, legal and factual insufficiency are not independent reversible grounds, but are relevant factors in assessing whether the trial court abused its discretion. *Mai v. Mai*, 853 S.W.2d 615, 618 (Tex.App.-Houston [1st Dist.] 1993, no writ). To determine whether there has been an abuse of discretion because the evidence is legally or factually insufficient to support the trial court's decision, we consider (1) whether the trial court had sufficient evidence upon which to exercise its discretion and (2) whether it erred in its application of that discretion. *In re T.D.C.*, 91 S.W.3d 865, 872 (Tex.App.-Fort Worth 2002, pet. denied).

Under the first prong, we apply the applicable sufficiency review. *Id.* In a legal sufficiency review, we consider all of the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex.2005). We consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding

unless a reasonable factfinder could not disregard it. *Id.* at 827; *Brown v. Brown,* 236 S.W.3d 343, 348 (Tex.App.-Houston [1st Dist.] 2007, no pet.). The factfinder is the sole judge of the credibility of the witnesses and the weight to give their testimony. *Wilson,* 168 S.W.3d at 819. The final test is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.* at 827.

In a factual sufficiency review, we consider all the evidence for and against the challenged finding and set it aside only if the evidence is so weak as to make the finding clearly wrong and manifestly unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). "In a bench trial, the trial court is the sole judge of the credibility of the witnesses, assigns the weight to be given their testimony, may accept or reject all or any part of their testimony, and resolves any conflicts or inconsistencies in the testimony." *Rich v. Olah,* 274 S.W.3d 878, 884 (Tex.App.-Dallas 2008, no pet.).

Under the second prong, we consider whether, based on the evidence, the trial court's decision was arbitrary, unreasonable, or without reference to guiding rules or principles. *In re T.D.C.,* 91 S.W.3d at 872.

In determining conservatorship and possession issues, the best interest of the child is always the primary consideration. TEX. FAM.CODE ANN. § 153.002 (Vernon 2008); *Lenz v. Lenz,* 79 S.W.3d 10, 14 (Tex.2002). Furthermore, public policy of this State is to (1) assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child, (2) provide a safe, stable, and nonviolent environment for the child, and (3) encourage parents to share in the rights and duties of raising their child after the parents have separated or dissolved their marriage. TEX. FAM.CODE ANN. § 153.001(a) (Vernon 2008). The burden of proof in conservatorship cases is a preponderance of the evidence. *Id.* § 105.005 (Vernon 2008); *Monroe,* 234 S.W.3d at 65.

## B. Joint Managing Conservatorship

Tracy argues that the trial court erred by appointing both her and Michael as joint managing conservators. Instead, she argued to the trial court that she should be appointed the sole managing conservator with a supervised possessory conservatorship for Michael.

In Texas, the trial court is required to presume that the appointment of the parents as joint managing conservators is in the best interest of the child until evidence is presented to rebut this presumption. TEX. FAM.CODE ANN. § 153.131(b) (Vernon 2008). When, as here, the parents do not file a written agreed parenting plan, the trial court may render an order appointing the parents joint managing conservators only if the appointment is in the best interest of the child. TEX. FAM. CODE ANN. § 153.134(a) (Vernon Supp. 2010). The trial court must consider the following factors:

(1) whether the physical, psychological, or emotional needs and development of the child will benefit from the appointment of joint managing conservators;

(2) the ability of the parents to give first priority to the welfare of the child and reach shared decisions in the child's best interest;

(3) whether each parent can encourage and accept a positive relationship between the child and the other parent;

(4) whether both parents participated in child rearing before the filing of the suit;

(5) the geographical proximity of the parents' residences;

(6) if the child is 12 years of age or older, the child's preference, if any, regarding the person to have the exclusive right to designate the primary residence of the child; and

(7) any other relevant factor.

*Id.* A finding of a history of family violence involving at least one of the parents of a child removes the presumption that a joint managing conservatorship is in the best interest of the child. *Id.* § 153.131(b). Family violence includes sexual abuse by one parent directed against a child. TEX. FAM.CODE ANN. § 153.004 (Vernon Supp.2010).

While there was not a *finding* of sexual abuse in this case, there was a claim that Michael had abused J.S., Tracy's child from a previous marriage. Implicit in Tracy's point of error is the argument that the trial court erred by not making this finding.

The allegations of sexual abuse first arose when a pastor at their church discovered J.S.'s journal that she had accidentally left behind. In the journal, J.S. had written that Michael and one of his sons, T.B., had touched her vaginal area. The pastor presented the journal to Tracy.

Michael was working late that day. Tracy asked a neighbor to help her talk to J.S. about what she had written. The neighbor agreed. It is undisputed that J.S. denied that T.B. had been involved. She stated that she only wrote that because she was angry at him at the time and thought no one would see it.

The neighbor testified that J.S. also recanted that she believed Michael had been the person. Instead, according to the neighbor, J.S. told them that she had been covered from head to toe on the couch in the living room and did not see who did it.

The three of them discussed it and could not figure out who could have done it. According to the neighbor, three or four days went by before it was said that Michael did it.

J.S. testified that she was lying on the couch and heard someone come out of the bathroom, come into the living room, and sit on the couch. This person touched her legs and then her vaginal area. She opened her eyes slightly to see who it was and saw that it was Michael. She took no action until he stopped and left. Then she ran up to her room and stayed there until he left. J.S. testified that she began cutting herself later as a result of the incident.

A friend of J.S.'s testified that she had spent the night with J.S. the night the journal was discovered. The friend testified that J.S. told her that night that Michael had been the one to touch her.

Once Michael got home on the night the journal was discovered, Tracy told him what J.S. had said. The next day, Michael called CPS to report the claim. Michael testified that he was the one who decided to make the call. Tracy testified that she told Michael to call.

Tracy and a friend of hers testified that Michael kept asking Tracy what his story should be when he talked to CPS. Michael denied this.

It was over two weeks before CPS investigated the claim. In the two weeks after the journal was discovered, Tracy and J.S. remained at the house. After two weeks, Tracy left, taking J.S. and C.B. with her.

At trial, the neighbor also testified that she had a daughter who had been sexually molested and subsequently began cutting herself. Ultimately, her daughter was sent to a mental health institution for help. This incident happened before J.S. wrote

about her alleged incident in her journal. The neighbor testified that her daughter and J.S. had been best friends, that J.S. knew about what had happened to her daughter, and that J.S. saw the attention that her daughter got when the molestation became known. The neighbor testified that she did not believe J.S. was telling the truth.

Delia Conrad, a former CPS employee who had worked on the case, also testified at trial. Delia testified that she thought J.S. was telling the truth because J.S.'s description of the events was consistent every time J.S. described the events to her. Delia testified that, in her experience, if the description of events remained consistent across time, it was the truth.

Both parties presented witnesses who testified about whether they thought J.S. was telling the truth, based on their knowledge of J.S.

■ There is testimony in the record that would have allowed the trial court to determine that the alleged sexual abuse took place. There is also, however, evidence in the record that calls into doubt the veracity of the allegations. Viewing the evidence in the light most favorable to the trial court's decision, as we are required to do, the evidence shows that J.S. accused two men, later recanted as to both, and still later went back and again accused her stepfather. The trial court evaluated her credibility in light of the other events in J.S.'s life, including her best friend's situation and her mother's marital difficulties. In these situations, appellate courts must defer to the determinations of the trial court. The factfinder is the sole judge of the credibility of the witnesses and the weight to give their testimony. *Wilson*, 168 S.W.3d at 819. "We may not pass upon the credibility of the witnesses or substitute our judgment for that of the trier of fact, even if a different answer could be reached upon review of the evidence." *Rich*, 274 S.W.3d at 884.

We hold that the trial court did not abuse its discretion in determining that the evidence did not support a finding that Michael sexually abused J.S.

Tracy also argues in her brief that there was evidence that Michael had been experiencing significant memory loss as a result an automobile collision in 2002. According to Tracy, these memory problems included forgetting to pick up the children when he had agreed to do so, leaving their toddler-aged daughter alone by a pool or pond on two separate incidents, and forgetting where he was going while driving.

Michael strongly disputed these allegations and denied that these events occurred. He also was tested by a psychiatrist for memory problems. The resulting report stated that Michael did not show significant signs of deficiency in memory functions.

The trial court was within its discretion in resolving this conflicting testimony in favor of Michael and determining that this evidence did not rebut the presumption that a joint managing conservatorship was in the best interest of C.B. We hold that the trial court did not abuse its discretion in appointing Tracy and Michael as joint managing conservators of C.B.

## C. Authorization for Michael to Designate the Child's Residence

Tracy challenges the findings given by the trial court as support for its determination that Michael should have the exclusive right to designate C.B.'s domicile. The trial court found that nine factors contributed to this determination:

 a. Michael Wayne Bush's separate property home is the home the child

resided in from birth until [the] date of separation.

b. Michael Wayne Bush has experience in parenting and has successfully parented two children as the primary custodian.

c. Michael Wayne Bush has close family ties and a good support system, his mother and sister both being actively involved and willing to assist.

d. Michael Wayne Bush was accused of sexually abusing his 15 year old step-daughter, an allegation that he brought to the attention of Child Protective Services. The evidence did not support a finding that Mr. Bush was guilty of the accusations. The evidence further showed that Tracey [sic] Bush did not believe the allegations at the time they were made but later used the allegations to support her efforts to obtain primary custody of her daughter. Because of this and other actions taken during the period of separation, the Court believes Tracey [sic] Bush would never encourage a relationship between Mr. Bush and the child subject to this suit.

e. The evidenced proved that Tracy Bush committed adultery during the marriage and on numerous occasions allowed her paramour to stay overnight while the child was present.

f. Evidence showed that Tracy Bush has a quick temper and that she raises her voice and yells at the child while Michael Wayne Bush is more passive and seems to possess a more even temperament.

g. Michael Wayne Bush is more stable than Tracy Bush. Michael Wayne Bush has resided in his separate property home for over 20 years and continues to reside at the same house.... On the other hand, Tracy Bush prior to the marriage would move repeatedly and since the parties['] separation has moved repeatedly....

h. Michael Wayne Bush was involved in the child's life from the very start.

i. The court finds that Mr. Bush is the parent most likely to encourage involvement by the other parent in the child['s] life. The court also finds that there is substantial evidence that Tracy Bush did and would continue to discourage a relationship between the child and Michael Wayne Bush.

We address each of these findings separately.

**1. Michael's residence was the residence of the child from birth until separation**

This was undisputed by the parties. We hold that there was sufficient evidence in the record to support the trial court's finding that "Michael Wayne Bush's separate property home is the home the child resided in from birth until date of separation."

**2. Michael has experience in parenting**

■ Michael was awarded custody of his two sons after his first divorce. They were ten and eight at the time. Michael was their sole provider for three years before he married Tracy. Throughout their lives, Michael took the boys hunting, fishing, and horse riding. He was heavily involved in their extracurricular activities and was given awards by the Cub Scouts for his involvement. Both boys went on to serve in the military after graduating from high school.

There was some testimony that Tracy pushed the boys to enter the military because they were "go[ing] downhill." This was contradicted by Michael as well as one of his sons, T.B., who stated that it had been his desire to enter the military since he was in junior high and that his inspira-

tion to go came from his older brother and his grandfather.

There was also conflicting testimony about Michael's disciplinary practices. T.B. testified that Michael would spank them when necessary but preferred to talk to the children to discuss why they were acting out. Michael testified similarly. Others testified that Michael was a poor disciplinarian and put inadequate boundaries on the children's behavior.

Tracy cites as proof of Michael's poor parenting the fact that his other son, K.B., once stole a boat. The only testimony about this incident came from Michael. Michael stated that K.B. "borrowed" the boat and could have been arrested for it. Following this incident, Michael kept K.B. with him at all times so that he could keep an eye on him in the time remaining before he entered the Navy.

Tracy also argues as proof of Michael's poor parenting that T.B. once threatened to leave home. This event occurred towards the end of Tracy and Michael's marriage. T.B. told Tracy and Michael that he was going to move out of the house. He testified at trial that the primary reason he wanted to move out was because of Tracy's constant yelling. Tracy, Michael, and T.B. discussed this for about five hours one evening. Ultimately, Tracy and Michael were able to convince T.B. to stay.

Tracy argues that, during the marriage, she assumed responsibility for the family cooking, laundry, taking the children to the doctor, buying clothes for the children, and attending the children's extracurricular activities. While most of this evidence is not in dispute, it does not resolve whether Michael had experience in parenting. Tracy's good acts a mother do not disprove Michael's experience in parenting.

We hold that there was sufficient evidence in the record to support the trial court's finding that "Michael Wayne Bush has experience in parenting and has successfully parented two children as the primary custodian."

### 3. Michael has close family ties and a good support system

■ Shortly after the suit for divorce was filed, the trial court entered temporary orders that were agreed to by the parties. Included in those orders was the requirement that Tracy would have temporary custody of C.B. and that Michael would be required to be always in the presence of a supervising adult during his visitations with her. The testimony at trial established that Michael's mother was the primary supervising adult during these visitations. The testimony at trial also established that this required significant effort on the part of Michael's mother since she lived a significant distance from Michael. Michael testified that he was close to his mother as well as to his three living siblings.

Michael's sister, Susan, testified that she would act as supervising adult during the visitations when her mother could not do it. She testified that it was difficult for her schedule but that she did it because she cared for Michael.

None of this evidence was contradicted. We hold that there was sufficient evidence in the record to support the trial court's finding that "Michael Wayne Bush has close family ties and a good support system, his mother and sister both being actively involved and willing to assist."

### 4. Tracy committed adultery

■ During the marriage, Tracy obtained a job with what is now BA Systems. Eugene was her supervisor. It is undisputed by the parties that, some time after Tracy began work, rumors began about Tracy and Eugene having an affair. Tracy discussed this with Michael early on and

told him not to believe the rumors. Michael testified that he trusted her that they were lies. On at least one occasion, Eugene came over to discuss the rumors with Michael, also stating that they were lies. The rumors persisted.

Michael testified that he would come home sometimes and find Eugene at the house with Tracy. T.B. testified that he came home once and found Eugene by their pool with Tracy cleaning the pool in a bikini.

Michael received multiple calls from Eugene's wife, who also insisted that Tracy and Eugene were having an affair. On one occasion after Michael and Tracy were separated, Eugene's wife called and the two compared times that both of their spouses were away from their respective homes. One of the instances included the night before this telephone conversation when Tracy was at Michael's house and then left to pick J.S. up from an event. The event was over at midnight, but Tracy left at 10:00 P.M. to pick up J.S. Michael later questioned Tracy about it, and she said she had just driven to the location early and had sat in the parking lot for two hours. Michael then called Eugene to question him about it. According to Michael, Eugene admitted to the affair. Michael stated that Tracy then admitted to being with Eugene but denied that anything inappropriate had happened. Michael stated that the next day Tracy told him she wanted a divorce.

Tracy testified that she had a sexual relationship with Eugene after her separation from Michael but never before. Eugene's testimony was the same. Tracy testified that Eugene stayed over at her new place on two or three nights when C.B. was also there. She testified, however, that this was before their sexual relationship began and that they slept in separate rooms on those nights.

Adultery, as used in a divorce proceeding, means the voluntary sexual intercourse of a married person with one not the husband or wife of the offender. *Bell v. Bell*, 540 S.W.2d 432, 435 (Tex.Civ.App.-Houston [1st Dist.] 1976, no writ). A finding of adultery is not limited to acts committed before the separation of the parties. *Id.* We hold that there was sufficient evidence in the record to support the trial court's finding that "[t]he evidence proved that Tracy Bush committed adultery during the marriage and on numerous occasions allowed her paramour to stay overnight while the child was present."

### 5. Tracy has a quick temper and raises her voice and yells at the child

Michael testified that Tracy yelled and screamed frequently at the children. He further testified that, throughout the marriage, Tracy took medicine for mood swings and that she yelled and screamed a lot when she was not on her medication. T.B. testified that Tracy yelled and screamed a lot and that was the primary reason he had wanted to move out of the house. He testified that they rarely made it through a dinner without someone getting yelled at. He also testified that Tracy took medication that she referred to as her "happy pills" that would help calm her down. The Bushes' neighbor testified that she saw Tracy scream and yell a lot and that she believed Tracy needed help calming down.

Tracy denied that she was on medication during the marriage or that she screamed and yelled a lot. She did testify that, after she was separated from Michael, C.B. observed that she hadn't yelled at them in a long time.

The uncontradicted evidence established that Michael rarely yelled at the children. T.B. testified that Michael preferred to

talk it over with the children when they misbehaved.

We hold that there was sufficient evidence in the record to support the trial court's finding that "[e]vidence showed that Tracy Bush has a quick temper and that she raises her voice and yells at the child while Michael Wayne Bush is more passive and seems to possess a more even temperament."

**6. Michael has lived in the same home for more than 20 years while Tracy has moved numerous times before and after the marriage.**

 It was also uncontradicted that Michael had lived in the same home for more than 20 years while Tracy had moved numerous times before and after the marriage. All of the relevant testimony established that Michael had lived in the same residence for over 20 years. Tracy testified that she moved eight times after her first divorce and before marrying Michael. She testified that she had moved three times in the year and a half following her separation from Michael. J.S. testified that she had been "raised to just up and move whenever [Tracy] said let's go."

We hold that there was sufficient evidence in the record to support the trial court's finding that Michael had more stable living conditions than Tracy.

**7. Michael was involved in the child's life from the start**

 While there was not a lot of testimony regarding Michael's involvement with C.B. individually, there was much testimony establishing Michael's involvement with the children generally. He attended extracurricular events and was otherwise active in his children's lives. After the separation, Michael made sure to have a supervising adult present during his visitation periods so that he could spend time with C.B. He also made efforts to attend C.B.'s extracurricular events outside of his visitation periods.

Tracy testified that Michael "lacked in the father nature other than he does come home and hug her." She also testified that on weekends he would maybe swim with her for half a day, but "that was about the extent of it."

We hold that there was sufficient evidence in the record to support the trial court's finding that "Michael Wayne Bush was involved in the child's life from the very start."

**8. Michael is more likely to encourage Tracy's involvement in the child's life than Tracy would encourage Michael's involvement**

 During their separation before the entry of the divorce decree, Tracy had primary possession of C.B. Michael testified that Tracy frequently scheduled events for C.B. to attend during Michael's visitation periods and would talk about them with C.B. to get her excited about them. Michael testified that he would go to the events to keep C.B. happy but got tired of the constant filling of his visitation time without his input. Michael also testified that, during his visitation periods, Tracy would call repeatedly throughout each day to talk to C.B. Michael's sister testified that this happened repeatedly during the visitations that she supervised.

As a part of the agreed temporary orders entered shortly after the divorce proceedings were initiated, Eugene—who was a third-party defendant in the suit at the time—was enjoined from coming within 200 feet of Michael or C.B. He was also enjoined from being in the presence of C.B. After these orders were entered, C.B. and T.S. were scheduled to be in a dance recital. Tracy knew that Michael would attend the recital. When Michael arrived,

he saw that Eugene was seated in the auditorium.

Testimony at trial established that the auditorium was not larger than 200 feet across. It was undisputed that Eugene did not have a child performing in the recital.

Michael approached and told Eugene that he needed to leave. Eugene refused. According to Michael, Tracy came out from the back and yelled at Michael for trying to make Eugene leave. Michael ultimately sat in another portion of the auditorium and was able to see C.B. perform during the first half.

During the intermission, Michael called the sheriff's office. A deputy came out but ultimately told Michael that he could not make Eugene leave. Michael decided to leave to avoid a conflict.

Tracy denied inviting Eugene or even knowing he would be there. Eugene testified that J.S. had invited him. When she did learn that Eugene and Michael were both there, Tracy did not ask Eugene to leave.

There is no evidence that Michael made any attempts to interfere with Tracy's relationship with C.B.

We hold that there was sufficient evidence in the record to support the trial court's finding that "Mr. Bush is the parent most likely to encourage involvement by the other parent in the child['s] life .... [and that] Tracy Bush did and would continue to discourage a relationship between the child and Michael Wayne Bush."

**9. The evidence did not support a finding that Michael was guilty of the accusations of sexual abuse, Tracy did not initially believe the allegations, and Tracy would not encourage a relationship between Michael and C.B.**

The trial court's fourth iterated finding actually consists of three findings: (1) that the evidence did not support a finding that Michael was guilty of the accusations of sexual abuse, (2) that Tracy "did not believe the allegations at the time they were made but later used the allegations to support her efforts to obtain primary custody of her daughter," and (3) that Tracy would not encourage a relationship between Michael and C.B. We have already addressed the first and third findings. We turn, then, to the second finding.

Michael testified at trial that, when the accusations came out, Tracy "knew it wasn't true," but did not explain how he knew this. Tracy testified that she was conflicted about the accusations and wanted to believe that her husband was innocent, but now does not. Tracy waited two weeks after J.S.'s accusation before moving out with J.S. and C.B. Tracy testified at trial that she waited two weeks because she had difficulty finding a place to stay and that she kept asking Michael to move out during this time. No evidence was introduced to contradict Tracy's statement that she was unable to find another place to stay during those two weeks. The testimony also established that Michael, Tracy, and J.S. made sure that Michael was not alone in the same room with J.S. during this period.

We do not need to determine whether the evidence was sufficient to support this finding, because, even if we did make such a determination, there is sufficient evidence in the record to support the rest of the trial court's findings. We hold that the trial court's findings support the determination that Michael should be the joint managing conservator with the exclusive right to designate C.B.'s domicile.

We overrule Tracy's second, third, and fourth points of error.

### Division of the Community Estate

In her fifth point of error, Tracy argues that the trial court abused its discretion in dividing the community estate. Specifically, she argues that the trial court erred by (1) considering a tax liability incurred by Michael's separate property business in its division of the community estate; (2) ordering an unequal division of the community property; and (3) insufficiently reimbursing the community estate for funds expended in improving Michael's separate property home.

### A. Standard of Review & Applicable Law

■ Pursuant to the Texas Family Code, "the trial court shall order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage." TEX. FAM.CODE ANN. § 7.001 (Vernon 2006); *Alsenz v. Alsenz,* 101 S.W.3d 648, 654 (Tex. App.-Houston [1st Dist.] 2003, pet. denied). The trial court has broad discretion in dividing the marital property and its division will not be disturbed on appeal unless the complaining party shows that the trial court clearly abused its discretion. *Alsenz,* 101 S.W.3d at 654–55 (citing *Murff v. Murff,* 615 S.W.2d 696, 698 (Tex.1981)).

The abuse of discretion standard of review for division of the community estate is the same as the abuse of discretion standard we have cited above for determining conservatorship of a child.

■ The trial court has wide discretion in dividing the community estate, but it must confine itself to the community property. *Jacobs v. Jacobs,* 687 S.W.2d 731, 733 (Tex.1985). When the court of appeals concludes that the trial court has mischaracterized property and thus abused its discretion in dividing the community estate, the reviewing court may not substitute its discretion for that of the trial court but must remand for a "just and right" division of the community estate, a matter lying solely within the discretion of the trial court. *Id.* at 732. Thus, if we find reversible error that materially affects the trial court's property division, we must remand the cause for a new division of the community estate. *Id.* at 732–33.

### B. Michael's Business's Tax Liability

■ In her fifth point of error, Tracy argues that the trial court abused its discretion and acted arbitrarily and unreasonably in dividing the community estate. Tracy argues that unpaid payroll taxes incurred by Michael's business, Prescom Equipment, are a debt incurred by Michael's separate property and that the trial court erred by considering the tax obligations in its division of the community estate. Specifically, Tracy argues that Michael took out a loan in the amount of $47,000, secured by land owned by the community estate in Crockett, Texas, in order to pay payroll tax obligations of his sole proprietorship, Prescom Equipment, and that the trial court erred in finding that the lien was a community liability and subtracting the $47,000 lien from the $78,000 fair market value of the land, and in thus finding that the land owned by the parties had a value of $31,000.

Prescom Equipment is Michael's sole proprietorship. Through Prescom Equipment, Michael repairs compressors, generators, and pressure washers for businesses. It is undisputed that Prescom Equipment is Michael's separate property. It is also undisputed that during the marriage Tracy participated in the business as an office manager and that the parties lived on the income from Prescom Equipment and filed joint federal income tax returns. Prescom Equipment also filed federal employment tax returns, and the

unpaid employment tax obligations, along with the resulting penalties and interest that accrued, arose during the marriage. For many months from 2002 to 2006, Prescom Equipment failed to file certain forms relating to employment taxes with the IRS and failed to pay the taxes for those same months. At some point in 2006, the IRS initiated an investigation regarding the missing forms and taxes. During this investigation, it was determined that at least $50,000 was owed by Prescom Equipment in taxes, penalties, and interest.

During the pendency of the divorce proceedings, the IRS threatened to force the sale of certain community property if Michael did not pay what was owed in employment taxes. The trial court ordered Michael to take out a loan against that property in order to pay what was owed to the IRS and ordered Tracy to sign the necessary documents to effectuate that loan. For reasons that do not affect our analysis of this issue, Tracy did not sign any loan documents. Michael eventually obtained a loan in the amount of $47,000 against the property in his name only, and the money owed to the IRS was paid.[1] Ultimately, the trial court determined that the $47,000 debt was a "liabilit[y] of the community estate [and was] considered by the Court in determining a just and right division."

In their briefs, both parties focus on whether Tracy could or should have been personally liable for the employment tax obligation to establish whether the payroll tax obligation should have been considered in the division of the community estate. Tracy cites to section 3.201 of the Family Code in support of her argument that she could not be held liable for the debt and, accordingly, the debt could not be consid-

ered in dividing the community estate. *See* TEX. FAM.CODE ANN. § 3.201 (Vernon 2006). Section 3.201 provides that a person is liable for acts of a spouse if the spouse acted as an agent for that person or incurred debt for necessaries and that "[e]xcept as provided by this subchapter, community property is not subject to a liability that arises from an act of a spouse." *Id.* at § 3.201(a)(1), (b). Michael argues that, because Tracy participated in the management of the business, the trial court was correct to determine that the tax obligation was a community liability.

■ Both Tracy's and Michael's arguments address the manner of determining liability of spouses to third-party creditors instead of the manner of determining whether certain debts and liabilities of the spouses are liabilities of the community and can therefore be considered in dividing the community estate. When a third-party creditor attempts to collect on a debt, liability to the creditor is not assessed against the community estate or the separate estates of the spouses. Instead, it is assessed against one or both of the parties to the marriage in their individual capacity. *See Nelson v. Citizens Bank and Trust Co. of Baytown, Tex.,* 881 S.W.2d 128, 131 (Tex.App.-Houston [1st Dist.] 1994, no writ) (holding contractual liability of one spouse allows creditor to reach that spouse's share of community property but does not make other spouse personally liable). Section 3.201 addresses when the acts of one spouse attach to the other spouse for purposes of liability to a third-party creditor. TEX. FAM.CODE ANN. § 3.201. Section 3.202 addresses what portions of the assets of the spouses can be reached by a third-party creditor after liability has been assessed against one or

---

1. Because the money constituting the difference between the $47,000 loan and the full amount paid to the IRS was not accounted for in the divorce judgment and this has not been raised by the parties, we do not make it part of our analysis.

both of the spouses. TEX. FAM.CODE ANN. § 3.202 (Vernon Supp.2010). Neither of these statutes addresses what debt can be considered as a debt of the community in creating a just and right division of the community estate.

During the trial, the trial court stated to the parties, "[W]hether [Tracy] was liable for [the taxes] ... is not going to change the character of whether it was or was not a community debt. Whether they're going to look to her individually once this is all said and done, doesn't transform it from community to a separate debt." We agree with the trial court. Whether a spouse is liable to a third-party creditor for the debt of the other spouse is a separate analysis from determining whether certain debts and liabilities of the spouses can be considered in dividing the community estate.[2] *See Inwood Nat'l Bank of Dallas v. Hoppe,* 596 S.W.2d 183, 185 (Tex.Civ.App.-Texarkana 1980, writ ref'd n.r.e.) (holding characterization and division of property in divorce have no effect on third-party creditor's rights); *Providian Nat'l Bank v. Ebarb,* 180 S.W.3d 898, 902 (Tex.App.-Beaumont 2005, no pet.) (holding determining debt to be community liability does not affect whether one spouse is liable to creditor for debt incurred by other spouse).

A sole proprietorship does not have a separate legal existence distinct from the operator of the business. *Ideal Lease Serv., Inc. v. Amoco Prod. Co., Inc.,* 662 S.W.2d 951, 952 (Tex.1983). The assets and liabilities of the sole proprietorship belong to the operator directly. *CU Lloyd's of Tex. v. Hatfield,* 126 S.W.3d 679, 684 (Tex.App.-Houston [14th Dist.] 2004, pet. denied) (citing BLACK'S LAW DICTIONARY 1398 (7th ed.1999)). Accord-

ingly, the employment-tax obligation belongs to Michael Bush directly, regardless of whether the obligation is characterized as a liability of the community or not. The parties do not dispute that Prescom Equipment itself is Michael's separate property. It remains for us to determine, then, whether the loan taken out by Michael to pay off the tax obligation incurred during the marriage is an obligation to pay off a debt of the community and therefore could properly be considered in dividing the community estate.

Community property is defined as "all property and pecuniary rights obtained by, or in the name of, either spouse after the marriage, by toil, talent, thrift, energy, industry, or other productive faculty, and all the rents, issues, profits, fruits, and revenues of separate property." *Alsenz,* 101 S.W.3d at 654 (quoting *Logan v. Logan,* 112 S.W.2d 515, 525 (Tex. Civ.App.-Amarillo 1938, no writ)). Profits gained from separate property are community property. *McElwee v. McElwee,* 911 S.W.2d 182, 188–89 (Tex.App.-Houston [1st Dist.] 1995, writ denied). Debts and liabilities incurred jointly by the spouses, such as federal income tax liabilities, must be considered by the trial court in determining a just and right division of the community estate and must be apportioned to one or both of the spouses. *In re S.A.A.,* 279 S.W.3d 853, 857 (Tex.App.-Dallas 2009, no pet.).

Michael introduced the parties' joint federal income tax returns for the periods relevant to the employment tax obligation. These showed that the business operated at a loss for some of the years in question. Tracy testified, however, that Michael regularly took money from the business that

**2.** While there may be a strong correlation between joint liability of the spouses and debts that can be considered in the division of the community estate, this does not mean that proof of one can stand in as proof for the other.

was never reported and that the tax returns did not accurately reflect the income of the business. She also testified that, if she needed cash, she would call Michael to get permission to take cash from the company account. Additionally, the record reflected that, during the relevant period, Tracy regularly wrote checks from the company's checking account for matters not related to the business. Therefore, the trial court could reasonably have determined from the evidence that income from Michael's sole proprietorship during the marriage was property of the community estate, that that income was increased and the community estate was benefitted by Prescom Equipment's failure to pay its federal employment taxes, and that the loan taken out by Michael to pay off Prescom Equipment's employment tax burden could, therefore, properly be apportioned to the parties jointly. *See Alsenz,* 101 S.W.3d at 654; *McElwee,* 911 S.W.2d at 188–89.

We hold that the trial court did not abuse its discretion by considering the tax obligation of Prescom Equipment when determining a just and right division of the community estate.

## C. Unequal division of the property

██ Tracy argues that the community property was divided giving Michael 65% of the community property and Tracy 35%. Tracy argues that this is not a just and right division of the community estate.

In making this argument, Tracy makes general statements like "the actual value of the community estate was approximately $108,000"; "the only asset of significant value was the property in Crockett"; and the remainder of the assets were "of nominal value, with the exception of some vehicles and trailers specifically valued in the findings of fact." Tracy does not support

these statements with citations to the record.

Furthermore, the value of the community estate or the value of the portions divided between the spouses is not readily discernable from the record. The findings of fact and conclusions of law include a list of what the trial court considered to be the assets and liabilities of the community estate along with the value that the trial court assigned to them. The divorce decree, however, orders the parties to keep what is in their possession except for certain enumerated items. Tracy does not provide citations to the portions of the record that would allow us to determine which items were in each of the spouses' possession in order to determine which assets were specifically awarded to the spouses. Without this information, we cannot determine what percentages of the community assets were awarded to each spouse. Because Tracy does not establish from the record the value of the community estate or the proportion of the estate that was awarded to her, we hold that this issue has been waived. *See* TEX.R.APP. P. 38.1(i).

## D. Reimbursement of the community estate

██ Finally, Tracy argues that the trial court erred by ordering Michael to pay an inadequate amount to reimburse the community estate for improvements made to Michael's separate property residence.

The trial court ordered Michael to pay $35,000 to Tracy as a part of the divorce. This amount constituted Tracy's portion of the reimbursement owed to the community estate for the improvements to Michael's separate property as well as money owed to create a just and right division of the marital estate. The trial court did not otherwise designate what amount of the $35,000 was for reimbursement or what

amount was for creating a just and right division.

Tracy argues that the record establishes that $120,839.00 in community funds were spent on improving Michael's separate property and, therefore, ordering Michael to pay $35,000 to Tracy—an amount that was not solely for compensation for the community funds spent—was necessarily inadequate. There was much dispute between the parties at trial over how much money was spent to improve Michael's separate property. As we have said, the trial court did not specifically state what it determined to be the amount owed to the community estate for these improvements.

Even if we assume that the trial court agreed with Tracy about the amount owed for reimbursement, we find no error. Under her scenario, Tracy's half of the funds owed to the community would be $60,419.50. In addition, her half of the liabilities owed by both parties is $32,500.12. The trial court only ordered Tracy to pay $350 of her half of the liabilities, however. Michael was ordered to pay the rest. Because Michael has to pay $32,150.12 of Tracy's half of the obligations, this offsets the $60,419.50 that Tracy alleges he owes to her. Accordingly, Michael would only be ordered to pay Tracy $28,269.38 for her portion of the reimbursement owed to the community. This would leave $6,730.62 for the amount required to create a just and right division of the community estate, an amount that we have no reason to question. Accordingly, even if the trial court agreed with Tracy as to the amount owed for reimbursement to the community estate, Tracy was adequately compensated for her portion of the reimbursement owed to the community estate.

We overrule Tracy's fifth point of error.

## Characterization of Horses

In her sixth point of error, Tracy argues that there was no evidence to support the trial court's finding that four horses were Michael's separate property.

### A. Standard of Review & Applicable Law

Separate property consists, in part, of property acquired by the spouse during marriage by gift. TEX. CONST. art. XVI, § 15; TEX. FAM.CODE ANN. § 3.001(2) (Vernon 2006). "Community property consists of the property, other than separate property, acquired by either spouse during marriage." TEX. FAM.CODE ANN. § 3.002 (Vernon 2006). "Property possessed by either spouse during or on dissolution of marriage is presumed to be community property." Id. § 3.003(a) (Vernon 2006).

■ To defeat the community property presumption, a spouse must establish by clear and convincing evidence that property is separate property. Id. § 3.003(b). Clear and convincing evidence is defined as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Id. § 101.007 (Vernon 2008). "The presumption, which is not evidence, ceases to exist upon introduction of positive evidence to the contrary and is not then to be weighed or treated as evidence." Harris v. Harris, 765 S.W.2d 798, 802 (Tex.App.-Houston [14th Dist.] 1989, writ denied).

When conducting a legal-sufficiency review under the heightened burden of proof for establishing separate property, we must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." In re J.F.C., 96

S.W.3d 256, 266 (Tex.2002); *see also Sta-vinoha v. Stavinoha,* 126 S.W.3d 604, 608 (Tex.App.-Houston [14th Dist.] 2004, no pet.) (applying standard to determination of separate property). We must "assume that the factfinder resolved disputed facts in favor of its finding if a reasonable fact-finder could do so," and "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *J.F.C.,* 96 S.W.3d at 266.

### B. Characterization of Horses

Tracy challenges the trial court's finding that four horses—Pepper, Lady, and two bay mares that do not have names—were Michael's separate property. All relevant testimony established that Pepper and the two bay mares were gifts. The dispute concerns whether they were gifts to Michael or gifts to the family. Additionally, all relevant testimony established that Lady was purchased from funds obtained from either a settlement or insurance proceeds stemming from injuries sustained by Pepper.

 Tracy argues that a claim for separate property must be supported with documentary evidence and that mere testimony will not overcome the community presumption. She cites *In re Santopadre,* No. 05-07-00027-CV, 2008 WL 3844517 (Tex.App.-Dallas Aug. 19, 2008, no pet.) (mem.op.) as authority. In *Santopadre,* the court held, "A party claiming separate property must support the claim with documentary evidence; mere testimony that property is separate is generally insufficient to overcome the community presumption." *Id.* at *2. *Santopadre* cites *Boyd* as authority for its holding. *Id.*

(citing *Boyd v. Boyd,* 131 S.W.3d 605, 612 (Tex.App.-Fort Worth 2004, no pet.)). *Boyd,* however, dealt with purchases, not gifts: "as a general rule, mere testimony *that property was purchased with separate funds,* without any tracing of the funds, is insufficient to rebut the community presumption." 131 S.W.3d at 612 (emphasis added).

 It is well established that, in order to show that property purchased during the marriage is separate property, it is not enough to simply state that the funds used to purchase the property were separate property funds; instead there *typically* must be some sort of documentary tracing to show that the funds used were separate property. *See, e.g., id.; Zagorski v. Zagorski,* 116 S.W.3d 309, 316 (Tex.App.-Houston [14th Dist.] 2003, pet. denied). The Dallas Court of Appeals has acknowledged in a published opinion that testimony on characterization of property can be sufficient when it is not contradicted and is supported by other evidence or testimony. *Pace v. Pace,* 160 S.W.3d 706, 714 (Tex. App.-Dallas 2005, pet. denied).[3]

These rules do not apply to the three of the four horses that were given as a gift: Pepper and the two bay mares. It is undisputed that these three horses were gifts. Property that is given as a gift, regardless of whether it is given to one person or to multiple people, is separate property. TEX. CONST. art. XVI, § 15; TEX. FAM.CODE ANN. § 3.001(2); *see also Roosth v. Roosth,* 889 S.W.2d 445, 457 (Tex.App.-Houston [14th Dist.] 1994, writ denied) (holding attempted gift by third party to community estate vests each

---

3. It is evident that, even though it was issued more recently, *Santopadre* was not meant to overrule *Pace. Santopadre* was a memorandum opinion. *In re Santopadre,* No. 05-07-00027-CV, 2008 WL 3844517 (Tex.App.-Dal-las Aug. 19, 2008, no pet.) (mem.op.). Memorandum opinions discuss only issues that are settled and cannot alter or modify existing rules. TEX.R.APP. P. 47.4.

spouse with one-half undivided interest in property as his or her separate property).

■ Pepper was one of the horses given as a gift. Michael testified that Pepper was a gift to him from a friend named Gail Ray. Tracy testified that Pepper was a gift to the family. Gail Ray, however, testified that she gave Pepper to Michael specifically.

■ One controlling factor in determining the character of property given as a gift "is the donative intent of the grantor at the time of the conveyance." *Rusk v. Rusk*, 5 S.W.3d 299, 303 (Tex.App.-Houston [14th Dist.] 1999, pet. denied). We hold that Gail Ray's testimony on her donative intent was legally sufficient to establish that Pepper was Michael's separate property.

■ For the two bay mares, Michael testified that they were gifts from his uncle to him. Tracy testified that the bay mares were given to the entire family. No other evidence or testimony was given concerning to whom the gifts were intended to be given. The trier of fact is the sole judge of the credibility of the witnesses and the weight to give their testimony. *Wilson*, 168 S.W.3d at 819. When there is conflicting evidence, it is the province of the trier of fact to resolve such conflicts. *Id.* at 820. Nothing in the record establishes that it was error for the trial court to resolve this conflicting evidence in favor of Michael.

■ Lady was the only horse of the four that was purchased during the marriage. Both Tracy and Michael agreed that funds were received as a result of injuries sustained by Pepper following an explosion on adjacent property. Tracy testified that the funds were part of a pre-lawsuit settlement by the owners of the adjacent property. Michael testified that the funds were part of insurance proceeds.

"Insurance proceeds paid or payable that arise from a casualty loss to property during marriage are characterized in the same manner as the property to which the claim is attributable." TEX. FAM.CODE ANN. § 3.008 (Vernon 2006). We have already determined that Pepper is Michael's separate property. Accordingly, any insurance proceeds arising from casualty loss to Pepper is also separate property. We hold that the result should be the same for settlement proceeds. Settlement proceeds paid or payable that arise from a casualty loss to property during marriage are characterized in the same manner as the property to which the claim is attributable. Because the result would be the same, we do not need to evaluate the discrepancy between Tracy and Michael's testimony concerning whether the funds were obtained from a settlement or from insurance proceeds.

The parties agreed that the proceeds obtained from the casualty loss to Pepper were used to purchase Lady. Because the parties agreed that these proceeds were used to purchase Lady, there was no need at trial to trace the proceeds. *See Pace*, 160 S.W.3d at 714. Accordingly, we hold that the evidence is legally sufficient to establish that the trial court could have formed a firm belief or conviction that Lady was Michael's separate property. *See J.F.C.*, 96 S.W.3d at 266.

We hold that the evidence was legally sufficient to establish that Pepper, Lady, and the two bay mares were Michael's separate property. We overrule Tracy's sixth point of error.

### Conclusion

We affirm the judgment of the trial court.