**Affirmed and Memorandum Opinion filed August 9, 2012.**



In The

# Fourteenth Court of Appeals

### NO. 14-11-00341-CV

## IN THE INTEREST OF C.Y.C., A CHILD

**On Appeal from the 247th District Court
Harris County, Texas
Trial Court Cause No. 2008-54640**

## M E M O R A N D U M   O P I N I O N

The Mother of C.Y.C. appeals from the trial court's Final Order in Suit to Establish the Parent Child Relationship on numerous grounds. We affirm.

### Background

C.Y.C.'s Mother and Father began dating in March 2007. Father is a portfolio manager, and Mother works as a teacher's aide while going to school. Mother gave birth to C.Y.C. on March 21, 2008. Mother and Father lived together at Father's residence with C.Y.C. but never married. They had a tumultuous relationship.

At some point, Mother moved out of Father's residence and filed an Original Petition in Suit Affecting the Parent Child Relationship and Request for Temporary

Orders and Temporary Restraining Orders on September 11, 2008. The trial court signed Agreed Temporary Orders on December 9, 2008, in which Father was adjudicated to be the Child's father, and Father and Mother were appointed temporary joint managing conservators. Father filed an Original Answer to Petitioner's Petition to Adjudicate Parentage and Counter-Petition to Adjudicate Parentage on March 26, 2009. In his petition, Father asked to be appointed joint managing conservator with the exclusive right to designate C.Y.C.'s primary residence. Father filed a First Amended Counter-Petition to Adjudicate Parentage on April 13, 2009, requesting the court to appoint him sole managing conservator of C.Y.C. or, alternatively, joint managing conservator with the exclusive right to designate C.Y.C.'s primary residence.

The trial court signed a Temporary Order on April 24, 2009, determining Mother's and Father's possession of C.Y.C. and ordering alcohol screening of Mother and Father. On May 7, 2009, the trial court signed Agreed First Supplemental Temporary Orders that (1) set periods of possession; and (2) ordered Mother and Father to contact Vicki Longwill for a drug and alcohol abuse evaluation and to "follow the recommendations of Vickie Longwill for any subsequent treatment and/or counseling that she may deem necessary."

Longwill evaluated Mother on May 13, 2009; she found that Mother does not meet the criteria for a substance use disorder, and recommended that Mother successfully complete a family addiction education course and attend a minimum of ten Al-Anon[1] meetings. Longwill evaluated Father on June 10, 2009; she concluded that he meets the criteria for alcohol abuse and recommended that he abstain from alcohol for 12 months; successfully complete a family addiction education course; attend a minimum of 6-12 brief intervention sessions, to process the education materials provided; follow all discharge recommendations and provide a copy of his discharge plan to the court; contact Aid to Victims of Domestic Abuse (AVDA) if additional support is needed; and submit to random drug testing.

---

[1] Al-Anon is a support group for the "family of the alcoholic."

2

The trial court appointed Terisa Taylor as amicus attorney for C.Y.C. on August 27, 2009.

A bench trial commenced on November 2, 2009. At trial, Lieutenant Thad Olive testified that, based on police call slips, the police answered several alcohol-related disturbance calls to Father's residence after C.Y.C. was born. Olive testified that one of the police call slips indicated that Mother came to the police department with bruises on her arms and a bleeding nose allegedly caused by Father.

Bruce Jeffries, who provided alcohol and drug testing, testified that Mother tested negative when she was tested on April 20, 2009, but that Father tested positive for alcohol when he was tested on the same day.

Mother testified that she believes Father has an alcohol problem because "he would drink all the time." Mother testified that Father experienced "blackouts" and had no recollection of his behavior while he was drunk. Mother introduced a videotape to show Father's inappropriate behavior while drunk. The video shows Father taking off his pants and urinating off a balcony.

Mother acknowledged that she agreed in the Agreed First Supplemental Temporary Orders to Father having possession of C.Y.C. during the week while she is in school. She testified that she believed it was in C.Y.C.'s best interest to be with Father while she was in school because he "normally" does not start drinking until 9:00 p.m. and by that time she would be with C.Y.C. She claimed she did not see any reduction in Father's alcohol consumption after the agreed orders were signed.

Mother also complained that she cannot communicate with Father over the telephone because "he always blows up." A tape of a telephone conversation was played for the trial court. Father and Mother were arguing over possession of C.Y.C. and Father called Mother derogatory names.

After hearing this evidence, the trial court *sua sponte* ordered alternative placement for C.Y.C. because both parents were "real sick" and needed treatment. The

3

trial court ordered Mother and Father to undergo psychological evaluations. It ordered C.Y.C. be placed with Father's brother and sister-in-law and allowed Mother and Father visitation with C.Y.C. The trial court expressed its dissatisfaction with Mother for not having followed many of Longwill's recommendations after her evaluations, and with Father for not having followed any of Longwill's recommendations after his evaluation. The trial court ordered Mother and Father to start treatment.

The trial court signed temporary orders on March 31, 2010, ordering C.Y.C. be returned to Mother and Father with week-on and week-off possession periods and a mid-week visit. The trial court appointed Dr. Joan Anderson on January 5, 2010, to conduct psychological examinations and evaluations of Mother, Father, and C.Y.C.

The bench trial resumed on August 31, 2010.

Based on her psychological examination and evaluation of Mother and Father, Anderson testified at trial that she would recommend Mother and Father to be joint managing conservators with Mother being the "primary conservator" and Father having "at least" standard possession periods with C.Y.C. Anderson testified that both parents tested "generally within normal range," and that Mother's tests were slightly healthier than Father's. Anderson believed that Father is in denial about having an alcohol problem and does not accept that he can never drink again. She acknowledged that Father's drug and alcohol tests were negative, and that Father has good parenting skills and is a "good dad." Anderson testified that she has no concerns about Father's and Mother's parenting skills.

Lieutenant Olive testified by telephone that the police answered several alcohol-related calls to Father's residence. These calls were made before the November 2, 2009 trial began and before the week-on and week-off possession periods began. Olive testified that one of the police call slips indicates that Mother came once to the police station complaining of domestic violence. Olive stated that he has not been to Father's residence within the last year.

4

Father's licensed chemical dependency counselor, Robin L. Hesse, testified that Father first started seeing her in January 2010 and continues to see her. Hesse stated that Father has provided her with proof of A.A. attendance and had been sober for ten months as of the date of Hesse's testimony. Based on her meetings with Father, Hesse believes that Father consistently has been working at the programs.

The Right Step counselor, Chris Davis, testified that Father attended and completed an intensive outpatient program. Davis stated that he got to know Father and that Father was sincere, motivated, and had developed a clear understanding how drinking has affected his life. Davis testified that he believes Father suffers from alcoholism and that abstinence is necessary; during treatment, Father acknowledged that he met the criteria for alcoholism.

Mother testified that she completed an anger management program and attended 90 Al-Anon meetings in 90 days as ordered by the trial court; she continues to attend Al-Anon meetings once a week and attends A.A. meetings once a month. She testified about what she learned from attending Al-Anon meetings and working on the 12-step program. Mother described her relationship with Father and her concerns about Father's "drinking problem." She testified that Father is a good dad and provider; he always has been flexible when it comes to C.Y.C. and has never turned her down when she asked him for help.

Father testified that he has completed an anger management program and The Right Step intensive outpatient program; is attending A.A. meetings regularly; has completed three steps of the 12-step program and is currently working on the other steps; has not had an alcoholic drink since October 31, 2009; recognizes that alcoholism is a disease; and recognizes that he suffers from alcoholism. He testified about how the alcohol treatment program educated him about his alcohol problem and affected his recovery process. Father stated that it is very difficult to co-parent with Mother because she cannot move on from the past, uses C.Y.C. as a "pawn," and does not reciprocate his flexibility in taking care of C.Y.C. Father stated he would be concerned about C.Y.C.'s

5

daily routine if Mother were to be appointed as C.Y.C.'s primary caregiver. Father is also concerned about Mother's violent character traits and her difficulty with disciplining C.Y.C. without spanking.

At the end of the trial, the trial court stated that both parents have not "gotten it." The trial court stated its desire to meet and talk with amicus attorney Taylor because the week-on week-off possession arrangement is not a viable permanent option for the future.

The trial court held a short hearing on January 19, 2011, to address some of Mother's complaints regarding the trial court's proposed final order. Mother filed a request for findings of fact and conclusions of law on January 26, 2011. The trial court signed a Final Order in Suit to Establish the Parent Child Relationship on January 27, 2011.

Mother filed a motion for new trial on February 10, 2011, contending that the trial court "committed reversible error and abused [its] discretion" because the trial court (1) appointed Father "as the primary custodial parent in a joint managing conservatorship when there was factually insufficient evidence to support such a finding and ruling;" (2) made a "ruling . . . against the overwhelming weight of the evidence;" and (3) acknowledged that Father was a "dry drunk" and "doesn't get it" so the "overwhelming evidence clearly supported the conclusion that only [Mother] was the logical choice to be appointed as custodial parent."

Mother filed an amended motion for new trial on February 25, 2011, arguing that (1) there is newly discovered, non-cumulative evidence that shows Father has continued consuming alcoholic beverages "since trial and post-rendition" in C.Y.C.'s presence, and this evidence "would most likely result in a different Court ruling;" and (2) "[a]fter the Final Order had been corrected, approved, and filed with the Court, it was altered without the consent or agreement of [Mother's] or [Father's] counsel . . . resulting in an award of attorney's fees in favor of [Father] and against [Mother]."

The trial court held a hearing on Mother's amended motion for new trial on March

6

9, 2011.  The trial court denied the motion after the hearing on the same day, and Mother put on a bill of exception.  The trial court signed findings of fact and conclusions of law on March 9, 2011.  The trial court signed an order denying Mother's amended motion for new trial on April 8, 2011.  Mother timely filed a notice of appeal.

**Analysis**

## I.    Domestic Violence

In her first issue, Mother contends that the trial court "abused its discretion and committed reversible error when it appointed the parties joint managing conservators despite credible evidence of a history or pattern of domestic violence committed by [Father] directed toward [Mother] within the two (2) years preceding the filing of the underlying paternity action."  Mother argues that the governing statute prohibits a trial court from appointing joint managing conservators if credible evidence is presented of a history or pattern of past or present child neglect, or physical or sexual abuse by one parent directed against the other parent.  *See* Tex. Fam. Code Ann. § 153.004(a) (Vernon 2008)

We review a trial court's decision on conservatorship for an abuse of discretion based on a review of the record as a whole.  *Bush v. Bush*, 336 S.W.3d 722, 729 (Tex. App.—Houston [1st Dist.] 2010, no pet.).  A trial court abuses its discretion when it acts arbitrarily or unreasonably, or without reference to any guiding rules or principles.  *Id.*  We view the evidence in the light most favorable to the trial court's decision and indulge every legal presumption in favor of its judgment.  *Id.*

When determining conservatorship, the trial court shall consider evidence of intentional use of abusive physical force by a party against a parent of the child within a two-year period before commencement of the suit.  Tex. Fam. Code Ann. § 153.004(a); *Stallworth v. Stallworth*, 201 S.W.3d 338, 347 (Tex. App.—Dallas 2006, no pet.).  The court may not appoint joint managing conservators if "credible evidence" is presented of a history of child neglect or physical or sexual abuse by one parent directed against the

7

other parent. Tex. Fam. Code Ann. § 153.004(b). When determining if "credible evidence" has been presented, the court shall consider whether a protective order was issued during the two-year period before commencement of the suit. *Id*. § 153.004(f).

There is a rebuttable presumption that the appointment of joint managing conservators is in the best interests of a child. Tex. Fam. Code Ann. § 153.131(b) (Vernon 2008). That presumption may be removed through a finding of a history of family violence. *Id*.; *Bush*, 336 S.W.3d at 731. When a trial court is presented with conflicting evidence, it may believe one witness and disbelieve others. *Viera v. Viera*, 331 S.W.3d 195, 210 (Tex. App.—El Paso 2011, no pet.). When nothing in the record demonstrates that the trial court failed to consider the testimony of family violence, the trial court rarely abuses its discretion in granting joint managing conservatorship. *Id*.

Mother contends that she "presented credible evidence that showed a history or pattern of physical abuse perpetrated by [Father] against [Mother];" that this evidence was "never rebutted, contradicted, nor disputed by" Father; and that this evidence was "substantially provided by disinterested parties." Mother did not testify at trial that Father physically abused her; to support her claim of domestic violence, Mother points to Lieutenant Olive's testimony and portions of Longwill's evaluation of Father.

Olive testified that a police call slip indicated that Mother came to the police station on July 27, 2008 to complain of a bleeding nose and bruises on her arm. Olive acknowledged that he did not "make the call" but merely read from the call slip to testify. The call slip was admitted into evidence; it stated that Mother "came in with poss fractured/bleeding nose . . . bruising to arms . . . getting x-rays . . . [Mother] adv her boyfriend did this to her . . . lives there with him and their baby . . . no info on male." (omissions in original).

In her evaluation of Father, Longwill stated that Father "reports . . . a July 2008 arrest and charge with Assault-Domestic and reports this charge was dismissed. . . . He reports a history of unresolved domestic violence." Longwill recommended that Father contact AVDA "if additional support is needed to resolve domestic violence issues."

8

Mother also claims that two other "incidents of [Father's] anger" support her claim of family violence: one in which, Mother threw a remote control at the television and Father "put his fist through the TV;" and another in which, Father broke a glass stove top at his residence.

The evidence introduced at trial contradicts Mother's assertions. Father testified that Mother "smashed" the glass stove top with a ladle and broke it. A police report introduced into evidence states that Mother admitted breaking the stove top. The police report stated: "domestic disturbance in progress . . . male stated female threatened him by smashing stove with large object . . . wife admitted to breaking glass stove top . . . no physical altercation at this time." Regarding the stove top, Anderson stated in her evaluation of Father that Father had reported Mother became upset and "took a pasta ladle and beat the glass top of his stove until it broke." The evaluation reflects that Father reported there were other incidents in which Mother "had broken his Bose music player, had broken two FM satellites, had broken a granite countertop with a hammer."

Father testified that he has concerns regarding "violence on [Mother]'s part." Father recalled a time when Mother held four-month-old C.Y.C. in one arm and held an eight-inch knife in the other hand while running down the stairs and threatening to cut the tires of his car. Father also recalled that Mother got upset because he was late one day so she "swung the baby and pulled the baby out and then basically took off in the car." Mother denied having behaved in a physically violent manner but admitted to "verbally" violent behavior.

Anderson's evaluation also reflects a different version of the July 27, 2008 incident that Mother reported to the police:

> [Father] told about an assault charge in July of 2008 when [Mother] had 'had four West University Police officers come into his house and arrest him for assault.' He had to pay $10,000 to defend himself. When asked what happened, he said it was a Sunday morning around 9:30 and [Mother] had told him she wanted $3000 to retain an attorney and if he did not give it to her she would destroy the house. He said to leave him alone so she put the baby in the crib, pulled the curtain down including the rod, and threw

9

the remote into the TV causing the screen to be destroyed. He said she went to his desk and threatened to throw the computer monitor off the balcony and head butted him to the point of him having to have two surgeries on his nose. He said, 'I defended myself and her face came into my hands and she had a little bit of a nose bleed.' He said she got in the car and went to the emergency room where the doctor asked if she had been assaulted and she said yes. [Father] said he was outside with [C.Y.C.] in the stroller when [Mother] came back with the policeman who arrested him for assault. They took him to the city jail for 22 hours and, in court, it was said that he had backhanded her in the face and broken her nose. Six months later, the charges were dismissed after [Mother] said that the West University Police had over-reacted.

Anderson's evaluation reflects that Father reported other physically violent behavior on Mother's part:

He said the last time [Mother] had hit him in the head with her cell phone and threw him down the stairs (she weighs 125 pounds and he is a very big man) so he called a friend who came and picked him up and took him home. [Father] said, 'I caught on. The police said you need to call us and we will come arrest her. You are enabling her.' He said that, in October/November of 2008, 'She punched me ... she got very upset that I had friends come over to eat so I went outside and she punched me with a closed fist. ... I had a pending assault case so I did not call the police.' He said that, when [C.Y.C.] was about four months old, [Mother] had the baby in one hand and a knife in another, and slashed the tires on his Porsche Cayenne. . . . He said [Mother] . . . bent his finger back to the point of spraining it.

Contrary to Mother's contention that she "presented credible evidence that showed a history or pattern of physical abuse perpetrated by [Father] against [Mother]" and that this evidence was "never rebutted, contradicted, nor disputed," the record establishes that the trial court was presented with conflicting evidence. Nothing in the record undisputedly establishes a history or pattern of family violence by Father against Mother. The evidence of physical abuse by Father was disputed or cast into doubt by other evidence. The trial court is the sole judge of the weight and credibility of the evidence. *Coleman v. Coleman*, 109 S.W.3d 108, 111 (Tex. App.—Austin 2003, no pet.). The trial court reasonably could have concluded that the evidence presented at trial was not credible evidence that amounted to a history or pattern of physical abuse by Father.

10

Therefore, the trial court was not required to exclude Father from joint managing conservatorship under Section 153.004. We conclude that the trial court did not abuse its discretion by appointing the parties as joint managing conservators.

We overrule Mother's first issue.

## II.    Joint Managing Conservatorship with Exclusive Rights

In her second issue, Mother argues that the trial court abused its discretion when it appointed Father as "the primary custodial parent of the parties' minor child because such a ruling was not in the best interest[] of [C.Y.C.] nor was such a ruling factually supported by evidence."

The trial court's conservatorship determinations are subject to review only for abuse of discretion and may be reversed only if the decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). Unlike termination findings, which must be supported by clear and convincing evidence, findings on conservatorship determinations must be supported by a preponderance of the evidence. *Id*. Under the abuse of discretion standard, legal and factual sufficiency of the evidence are not independent grounds of error but are relevant factors in assessing whether the trial court abused its discretion. *Baltzer v. Medina*, 240 S.W.3d 469, 476 (Tex. App.—Houston [14th Dist.] 2007, no pet.). There is no abuse of discretion as long as some evidence of a substantive and probative character exists to support the trial court's decision. *Id*.

In a legal sufficiency review, we consider all of the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not disregard it. *Id*. at 827. The factfinder is the sole judge of the credibility of the witnesses and the weight to give their testimony. *Id*. at 819. In a factual sufficiency review, we consider all the evidence for

11

and against the challenged finding and set it aside only if the evidence is so weak as to make the finding clearly wrong and manifestly unjust. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406-07 (Tex. 1998); *Bush*, 336 S.W.3d 730. In a bench trial, the trial court is the sole judge of the credibility of the witnesses, assigns the weight to be given their testimony, may accept or reject all or any part of their testimony, and resolves any conflicts or inconsistencies in the testimony. *Bush*, 336 S.W.3d at 730.

In determining conservatorship and possession issues, the best interest of the child always is the primary consideration. *In re J.A.J.*, 243 S.W.3d at 614. The trial court is given wide latitude in determining the best interest of a child. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *Swaab v. Swaab*, 282 S.W.3d 519, 532 (Tex. App.— Houston [14th Dist.] 2008, pet. dism'd w.o.j.). Unless it would not be in the best interest of the child, the trial court shall appoint a parent as sole managing conservator or both parents as joint managing conservators of the child. Tex. Fam. Code Ann. § 153.131(a) (Vernon 2008).[2]

It is a rebuttable presumption that the appointment of the parents as joint managing conservators is in the best interest of the child. *Id*. § 153.131(b). In an order appointing joint managing conservators, the court shall designate the conservator who has the exclusive right to determine the primary residence of the child. *Id*. § 153.134(b)(1) (Vernon 2008). The trial court's order also must allocate between the parents, independently, jointly or exclusively the remaining rights and duties of a parent. *Id*. § 153.134(b)(4). The trial court retains broad discretion in crafting the rights and duties of each conservator in effectuating the best interest of the child. *Swaab*, 282 S.W.3d at 533.

[2] In determining whether it is in the best interest of the child to appoint the parents as joint managing conservators, a court considers the following factors: (1) whether the physical, psychological, or emotional needs and development of the child will benefit from the appointment of joint managing conservators; (2) the ability of the parents to give first priority to the welfare of the child and reach shared decisions in the child's best interest; (3) whether each parent can encourage and accept a positive relationship between the child and the other parent; (4) whether both parents participated in child rearing before the filing of the suit; (5) the geographical proximity of the parents' residences; (6) if the child is 12 years of age or older, the child's preference, if any, regarding the person to have the exclusive right to designate the primary residence of the child; and (7) any other relevant factor. Tex. Fam. Code Ann. § 153.134(a) (Vernon 2008).

With these principles in mind, we examine Mother's second issue.

Mother argues that the trial court abused its discretion by appointing Father as joint managing conservator with the exclusive right to designate the primary residence of C.Y.C. because Father is "an unrecovered alcoholic, who had used physical, verbal, and emotional abuse on the other parent."

The trial court first heard evidence on November 2, 2009, when the bench trial commenced. At that time, Mother called Lieutenant Olive. He testified that, based on police call slips, the police answered several alcohol related disturbance calls to Father's residence after C.Y.C. was born. As discussed in issue one above, Olive also testified that one of the police call slips indicated that Mother came to the police department with bruises on her arms and a bleeding nose allegedly caused by Father. On cross-examination, Olive could not recall testifying at a previous court hearing that he had given Father advice that, if "he didn't get" Mother out of his house, "she was going to kill him."

Bruce Jeffries, who provided alcohol and drug testing, testified that Mother tested negative when she was tested on April 20, 2009, but that Father tested positive for alcohol when he was tested on the same day.

Mother testified at length. She stated that she believes Father has an alcohol problem because "he would drink all the time" when she lived at his residence; he would leave the house three to four times a week to drink; and he would drink at his home if he did not go out to drink. Mother testified that Father would experience "blackouts" and had no recollection of his behavior while drunk. Mother videotaped Father on June 7, 2008 at 10:46 p.m. The video shows Father drunk at his home; falling out of bed; yelling out random words while Mother tells him to be quiet because C.Y.C. is sleeping; taking off his pants and urinating off a balcony; coming back inside the house and exposing his buttocks; going to the kitchen to get an alcoholic drink from the refrigerator; and spitting off a balcony. Mother testified that Father was exhibiting the type of behavior shown on the video four days per week.

13

Mother acknowledged that she agreed in the Agreed First Supplemental Temporary Orders to Father having possession of C.Y.C. during the week while she is in school. She testified that she believed it was in C.Y.C.'s best interest to be with Father while she was in school because he "normally" does not start drinking until 9:00 p.m. and by that time she would be with C.Y.C.. Mother testified that she saw Father consume alcohol "a few days ago;" she also could smell alcohol on his breath "quite a few times" and reminded him that he was not allowed to consume alcohol for at least 24 hours when C.Y.C. is in his care per agreed orders. She claimed she did not see any reduction in Father's alcohol consumption after the agreed orders were signed.

Mother also complained that she cannot communicate with Father over the telephone because "he always blows up." The trial court heard a taped telephone conversation in which Father and Mother were arguing over possession of C.Y.C.; Father called Mother derogatory names but, according to the trial court, Mother was "baiting him."

After hearing this evidence, the trial court ordered alternative placement for C.Y.C. The trial court stated that Mother's video of Father "states a lot to me about her judgment if she's allowed the child to be with him five days a week. . . . Knowing that he drinks this way if, indeed, that's what this thing shows." The trial court told Father that he is sick, needs "alcohol treatment," and told Mother that she is "real sick too" and that she needs treatment for her "incredible co-dependency" and "anger problems." The trial court told Mother that it was "appalled at what kind of mother" she is to let C.Y.C. stay with Father because it is convenient for her to have Father babysit C.Y.C., especially knowing Father has not stopped drinking and how Father behaves when he is drunk.

The trial court also expressed its dissatisfaction with Mother for not having followed many of Longwill's recommendations after her evaluations and with Father for not having followed any of Longwill's recommendations after his evaluation. The trial court ordered Mother to "get some good therapy" for her "major codependency" and "control issues" and attend 90 meetings in 90 days; the court ordered Father to start

14

outpatient alcohol treatment and attend a minimum of 90 meetings in 90 days.

The trial court returned C.Y.C. to Mother and Father in March 2010 with week-on and week-off possession periods and a mid-week visit. When the bench trial resumed in August 2010, the trial court heard more testimony about the parents' progress and parenting abilities.

Anderson, who prepared Mother's and Father's psychological evaluations, testified that, based on her evaluation, she would recommend that the parents should be joint managing conservators with Mother having the exclusive right to designate the Child's primary residence and Father having "at least" standard periods of possession. Anderson stated that both parents tested "within normal range" but that Mother's tests were slightly healthier because Anderson believed Father "shaded the truth on alcoholism." Although Anderson believed that Father has not attended A.A. meetings regularly and is in denial about having an alcohol problem, she acknowledged that she "could be wrong."

Anderson testified that she has no concerns about Father's parenting skills as long as he does not drink. She stated that C.Y.C. seemed comfortable with Father but that C.Y.C. exhibited some unusual behavior during the evaluation sessions in that C.Y.C. tried to interact with Anderson and not her Father. Father denied this assertion. Anderson concluded that Father is "a good dad" and "has good parenting skills."

Anderson also testified that she had no concerns regarding Mother's parenting skills. Anderson stated that Mother and C.Y.C. were very close during the evaluation and that C.Y.C. "clung" to Mother. She testified that Mother admitted minor faults and shortcomings during her evaluation. Anderson stated that she is aware that Mother leaves C.Y.C. in Father's care while she is in school; Anderson believed this shows that Mother wants to foster a relationship between Father and C.Y.C. In her report, Anderson stated that Mother has "histrionic traits" and has "some significant anger management issues."

Mother called Lieutenant Olive as a witness; he again testified that the police

answered several calls to Father's residence because Father had been drinking excessively. Olive acknowledged that these calls occurred before the November 2009 trial began. Olive also testified that one of the police call slips indicated that Mother came to the police station with bruises on her arms and a bleeding nose allegedly caused by Father. Olive acknowledged that the police had not been to Father's residence within the last year.

Mother testified that she requested the trial court appoint her and Father joint managing conservators with her as the "primary custodial parent." She acknowledged that she completed an anger management program because the trial court had ordered her to do so; she did not believe she had a problem. Mother testified that she attended 90 Al-Anon meetings in 90 days as ordered by the trial court and continues attending meetings once a week. She explained that through Al-Anon she learned how to deal with Father on a daily basis regarding co-parenting; she also learned that alcoholism is a disease and how to use Al-Anon tools.

Mother testified that she is concerned that Father continues to drink alcohol. She introduced a video she took on June 9, 2010 in his home that showed Father kept several non-alcoholic beers and one alcoholic beer in his refrigerator; and on his pantry top shelf, there was a vodka bottle and some other beverages in a box. Mother testified that she has seen no change in Father's character and that, as an alcoholic, he embellishes stories.

Mother testified that Father's banking records establish that he made 13 purchases at Spec's liquor store after his October 31, 2009 sobriety date. However, the evidence showed that the purchases were for ice, cheese, and non-alcoholic beer. Mother acknowledged that she has not seen Father drink alcohol since the trial court signed the week-on week-off possession order.

Mother accused Father of not providing her with health insurance information for C.Y.C. and not adding her as an authorized user on his medical insurance. Father disputed Mother's claim and testified that Mother had his health insurance card with all applicable telephone numbers since the birth of C.Y.C. and could have called regarding

16

insurance questions and providers. He also explained that he cannot add Mother as an authorized user on his medical insurance because Mother is not an employee of Father's employer.

Mother testified that Father "is a good dad. He is a good provider. He shows — he likes being with [C.Y.C.]. Every time that I have asked him to help me with school, like if I needed him to watch [C.Y.C.], he's never turned me down. He's always said, 'Yeah, sure.' You know, he is very flexible when it comes to [C.Y.C.]. He's good."

Mother acknowledged stating in her answers to interrogatories on July 16, 2010, that "Father has been emotionally, verbally and mentally abusive, and neglectful to our [C.Y.C.]. . . . [Father's] home life lacks consistency and he is unable to care for the minor child himself. He has employed (3) nannies . . . has no time for the minor child and rarely interacts with her. He tells her to be quiet so he can read the newspaper instead of attending to the minor child's needs." Mother also acknowledged that she wrote on Family Wizard on August 25, 2010, that C.Y.C. is "extreme[e]ly smart and a very happy Child[,] she is right on target with where she needs to be . . . I think it is good on how we communicate on these things that [C.Y.C.] does because we are both [] keeping a good eye on her." Mother claimed that her interrogatory answers and the Family Wizard message to Father are "both correct."

Mother also testified that she does not believe Father is "capable with his disease to take care of [C.Y.C.] full-time. On and off a couple of hours a day throughout the week, yeah, he's great with her. He knows how to do the fun stuff, the traveling, the pool, all that stuff, he knows how to do that." Mother acknowledged that she never filed for a modification of the week-on week-off possession order.

Mother complained that at the last two exchanges, C.Y.C. had nothing on except for diapers. She could not recall that Father had told her that C.Y.C. had no clothes on because C.Y.C. had spilled juice on herself on the ride to the exchange. Mother also complained that Father does not park next to her during the exchanges but chooses to park farther away so she has to walk over to his car; and Father does not hand C.Y.C.'s

17

belongings to her but places them on the floor during the exchanges.

Although Mother testified that she wanted the trial court to reduce the time C.Y.C. will spend with Father because she believes she has a more stable house for C.Y.C., she acknowledged that she is only spending about two hours per day with C.Y.C. She stated that C.Y.C. is in day care from 7:30 a.m. until 3:00 p.m. while she is at work and then from 5:00 p.m. until 8:30 p.m. while she is at school. Mother also acknowledged that she did not look into any preschool programs for C.Y.C. and that she intends to keep C.Y.C. in daycare until she starts school when she is five years old.

Mother admitted that she has engaged in "verbally" violent behavior. She admitted calling the police when Father kept a Tupperware container for C.Y.C. because Father "was controlling."

Mother claimed that she knows how to balance "standing her ground" and setting boundaries as she was taught in Al-Anon with common sense regarding C.Y.C.'s best interest. Yet, Mother acknowledged that, rather than "fall back into [her] illness" she insisted Father travel with C.Y.C. on a bicycle across Highway 59 to meet Mother for an exchange at Lakewood church instead of Mother driving to a restaurant across the street to meet Father and C.Y.C.

Father's chemical dependency counselor, Robin L. Hesse, also testified at trial; she stated that Father first started seeing her in January 2010 and continues talking to her once a week. Father completed anger management and intensive outpatient treatment at The Right Step — a treatment Father chose to pursue. Father has provided Hesse with proof of A.A. attendance and has been sober for ten months. Hesse testified that it is not unusual for "someone with alcohol abuse" to occasionally drink non-alcoholic beer. Based on her meetings with Father, Hesse believes that Father has consistently been working the programs; Father is following her recommendations and is not "just punching his ticket." Hesse testified that she has observed a big change in Father's stress management.

18

The Right Step counselor, Chris Davis, testified that Father attended and completed the intensive outpatient program. Davis stated that he got to know Father and that Father was sincere, motivated, and had developed a clear understanding how drinking has affected his life. Davis testified that he believes Father suffers from alcoholism and that abstinence is necessary; during treatment, Father acknowledged that he met the criteria for alcoholism and is an alcoholic.

Davis stated that he would be somewhat concerned if Father was going to a liquor store while attending A.A. and the 12-step program. Davis testified that he would caution an alcoholic to switch from alcoholic to non-alcoholic beer; Davis would be concerned if Father had vodka, wine or beer at his home because it could become a problem. Davis knew that Father had twelve random negative urine tests and believes that is a "positive point of recovery" that all tests came back negative.

Father testified at length at trial. He admitted being an alcoholic. He testified that his sobriety date was October 31, 2009, and that he is working daily on his recovery. He explained that attending The Right Step program affected his recovery process because it was an education about what alcoholism is and how it affects a person's mind. Father testified that he works daily on his relapse prevention plan. He admitted to not implementing Longwill's recommendations until the trial court took C.Y.C. away from both parents in November 2009.

Father disagreed with Anderson's assessment that he does not understand he can never drink alcohol. He stated that he has "accepted his alcoholism" and agreed that one does not beat the disease after one year. He stated that he intends to live his life never drinking alcohol again. Father testified that he attended his first A.A. meeting in October 2009. After he completed The Right Step program, he continued attending A.A. meetings at The Post Oak Group and several church groups; however, he did not think it was necessary to further document his attendance by signing in.

He testified that the longest he has gone without attending A.A. meetings was a few weeks. Father also admitted that he had not spoken to his sponsor in a few months

but then spoke again to him "last week." Father testified that he had completed three steps of the 12-step program and completed the fourth step with his therapist because he felt more comfortable "taking inventory" of his shortcomings with the therapist instead of with his sponsor. Father testified that he practices steps every day and continues to take a personal inventory daily. Father testified that watching the movie "Crazy Heart" affected his recovery process "very much." In the movie, an alcoholic lost a young child while ordering a drink in a bar and Father realized this could have happened to C.Y.C.

Father acknowledged that he had shopped at Spec's liquor store since his sobriety date on several occasions for everything except alcohol. Although he initially disagreed that a liquor store is the place he should most avoid, he later testified that looking back it was a bad decision to shop at Spec's. Father admitted having alcoholic beer and tequila in his home when Mother took the videotape in June 2010; he denied drinking any of the alcohol. Father testified that he has been subject to random monthly alcohol testing; he has tested negative.

Father also testified about C.Y.C.'s daily routine when C.Y.C. stays with him. He testified that C.Y.C. wakes up at 7:30 a.m., has breakfast, and spends time with him until the nanny comes to the house at 9:00 a.m. The nanny takes C.Y.C. to the park and Father gets ready for work. He leaves the house at 10:30 a.m. and returns from work at 4:00 p.m. When he gets home, Father talks to the nanny and C.Y.C. about the day and relieves the nanny of her duties. Father and C.Y.C. spend more time together and then get ready for dinner. C.Y.C. goes to bed around 9:30 p.m.; during exchanges, C.Y.C. goes later to bed to accommodate Mother's school schedule. Father testified that he had a 10:30 a.m. to 4:00 p.m. daily schedule since 2006 when he built a virtual office in his home. Father testified that he would be concerned about C.Y.C.'s daily routine if the trial court did not place C.Y.C. in his "primary care." Father stated that he has already visited schools he would like C.Y.C. to attend. He testified that he would pay for C.Y.C. to attend private school and disagreed with placing C.Y.C. in day care.

Father testified that Mother has dropped C.Y.C. off at his office unannounced at

20

times and he has always been flexible. Father complained that Mother does not reciprocate. For example, Father asked Mother to meet him and C.Y.C. at a restaurant across from Highway 59 instead of at Lakewood church so he would not have to cross the street on a bike, but Mother hung up on him saying "no way." Father stated he left Mother six messages asking for a convenient location to exchange C.Y.C. When Mother would not agree to any location, Father rode back to his house with C.Y.C. and then drove C.Y.C. in his car to the exchange.

Father also testified that Mother missed half of her mid-week visits with C.Y.C. and never gave him 24-hour notice that she would miss her visits with C.Y.C.; sometimes Mother would give him as little as two hours notice. Father denied placing C.Y.C.'s things on the floor during exchanges unless there was too much to carry. Father acknowledged parking several spaces away from Mother during exchanges to avoid conflict. He explained that Mother usually likes to look in his car to see if he has any beer in the car; she also wants to check if C.Y.C. is wearing a seatbelt because C.Y.C. has on occasion removed her arms from the seatbelt straps.

Father testified that he is concerned about Mother's anger issues. He recalled a time when Mother held C.Y.C., then four months old, in one arm and held an eight inch knife in the other hand while running down the stairs and threatening to cut the tires of his car. Father recalled that Mother got upset because he was late one day so she "swung the baby and pulled the baby out and then basically took off in the car." Father also testified that Mother had hit him and thrown things at him in the past. Anderson's evaluation confirms that Father recalled several instances in which Mother physically attacked him and destroyed items in his home.

Father also testified that Mother uses C.Y.C. as a pawn to get her way in certain instances. He stated that "[i]n the past it's been the automobile, the day care, the money to pay for all her bills. I didn't get to see my daughter for her first birthday or for Christmas or for Thanksgiving. She pulled her away from me. It's been a constant struggle to maintain a positive relationship with my daughter and to be the daddy. And

21

it's been frustrating as Hell in order to be the daddy for that daughter. Because if I don't give [Mother] her way, it becomes an argument. And my past was to drink and that was corrected. That was part of my defects. So now I want to move forward and raise my daughter." Father asked the trial court to look at his "sobriety from October 31, 2009, to the present."

Father testified that he is very concerned about how Mother will react when C.Y.C. misbehaves. According to Father, Mother called him to tell him that she wanted to learn how to discipline C.Y.C. without hitting her. Mother denied asking Father for help on how to discipline C.Y.C. Mother admitted describing C.Y.C. to Father as "salvaje." According to Mother, it is "the term like, when you're crazy, when you do things that are crazy."

Father also testified that C.Y.C. routinely cries and whines when she has to go back to Mother's house after being with Father.

In addition to the witnesses' testimony, the trial court read numerous e-mail exchanges between Mother and Father from which it could gain additional insight into the parents' actions and progress in parenting.

Although Mother correctly states in her brief that the trial court criticized Father and told him "he's not getting it," the court also criticized Mother and told her she too "is not getting it." The trial court was "not impressed" with how Mother and Father are "handling their maladies."

The trial court criticized Father for (1) buying non-alcoholic beer; (2) not being humble; (3) only getting tested once per month, which gives him "plenty of time to drink and get [alcohol] out of his system;" (4) being a "dry drunk" and not attending enough A.A. meetings; (5) not being more supportive during exchanges with Mother; and (6) being childish.

The trial court criticized Mother for (1) being a "massive control freak;" (2) "snooping around" in Father's car and home and taking photos; (3) not providing

22

necessaries for C.Y.C. but borrowing from Father; (4) committing "a boundary violation that is absolutely one of the core values in Al-Anon. You ain't getting it;" (5) still taking Father's inventory and "sticking" her nose in his business; (6) being childish and calling the police to get a Tupperware item back; and (7) invading Father's privacy. The trial court stated that she disagrees with Anderson's evaluation that Mother is "getting it." According to the trial court, Mother is "talking a better game" than Father but Mother's "behavior is atrocious" and does not show that she is learning what Al-Anon is teaching.

After reviewing the entire record and giving great deference to the trial court's ability to observe the witnesses and assess intangibles not apparent in the written record, we conclude that the trial court (1) had sufficient information upon which to exercise its discretion to appoint Father as "the primary custodial parent to" C.Y.C.; and (2) did not err in its application of that discretion.

We overrule Mother's second issue.

### III. Ex Parte Meeting

In her third issue, Mother argues that the trial court abused its discretion when it "went outside the record and conducted a private meeting with the court appointed amicus attorney."

At the conclusion of the bench trial, the trial court told amicus attorney Taylor, "I guess you and I need to meet and let's talk to see if we can come up with something that we can — we're not going to keep going the one-week, one-week, that's for sure because this baby is not going to be yanked from one place to another." In its findings of fact, the trial court stated, "On September 1, 2010 after all testimony and evidence was presented, the [trial court] recessed. The Court finds that more time is needed to rule and the Court finds it to be in the best interest of the child to meet with the Amicus and come up with a plan for this child."

On appeal, Mother argues that a private meeting between the trial court and Taylor was prohibited by the Texas Code of Judicial Conduct and the Texas Code of

23

Professional Conduct. Additionally, Mother contends that such a meeting prevents an unsuccessful litigant from presenting the entire record of the trial court proceedings for review in the appeals court.

Mother did not object when the trial court announced its intention to meet with Taylor alone to "come up with a plan for this child." Mother never objected to the private meeting at any other time. Mother did not request that the she or at least her trial counsel be present during the meeting, nor did Mother request that the meeting be recorded by a court reporter.

As a prerequisite to presenting a complaint for appellate review, the record must show that the complaint was made in the trial court by a timely request, objection or motion that stated the grounds for the ruling that the complaining party sought and the trial court ruled on the request, objection, or motion or refused to rule on the request, objection, or motion. Tex. R. App. P. 33.1(a).

Because Mother failed to present her complaint in the trial court, her alleged error presents nothing for our review.

Citing to *Villagomez Investments, L.L.C. v. Magee*, 294 S.W.3d 687 (Tex. App.—Houston [1st Dist.] 2009, no pet.), and Texas Rule of Appellate Procedure 34.6(f), Mother contends that she is entitled to a new trial as a matter of law because she timely requested a reporter's record of all portions of the trial and "through no fault of her own a significant portion of the reporter's record is missing." *Villagomez* is inapplicable in this case. In *Villagomez*, the court of appeals ordered a new trial pursuant to Rule 34.6(f) after the entire trial record had been destroyed by Hurricane Ike.

Here, the trial record is neither lost nor destroyed. To the extent that any portion is missing, it is missing because no one requested that the meeting between the trial court and Taylor be recorded. Although Mother asserts that she has "timely requested a reporter's record during all portions of the trial," the record does not support her assertion.

24

We overrule Mother's third issue.

## IV.    Amicus Attorney

In her fourth issue, Mother argues that the trial court abused its discretion when it appointed the amicus attorney as a "post-judgment tiebreaker."

The trial court's final order provides that "in the event the parties cannot agree on any of the rights stated herein above such as medical decisions, or any right that requires consultation with the other party, TERISA TAYLOR BRADY shall be the tie breaker of said issue, in that she shall make a recommendation regarding same and the parties shall follow her recommendation."

Mother contends that the Family Code does not allow "for the permanent placement of an amicus attorney as a post-trial 'parenting tie breaker,'" and that the trial court cannot properly sign an order that "continues to intervene in the parent-child relationship by assigning rights, privileges, and duties to a non-party/non-parent." Mother also contends that "the trial court abrogated its[] responsibilities and handed off its[] judicial obligations to a third party and permanently appointed the amicus attorney as a post-judgment 'parenting tiebreaker.'"

Mother never objected to the appointment of Taylor as a "tiebreaker" in the trial court — either during trial when Father suggested Taylor continue to be involved "with regard to major disputes with the child" after the trial court made its ruling, or at any time after trial.  To the contrary, Mother helped in clarifying the "tiebreaker" provision of the court's final order.  The trial court held a hearing on January 19, 2011, at which Mother and Father discussed and clarified the language of several provisions to be included in the trial court's final order.  One of the provisions that the parties worked on was the "tiebreaker" provision.  At no time did Mother object to having such a provision in the final order; instead, Mother asked for language to be added to the proposed provision to conform to the trial court's rendition of December 21, 2010.

Because Mother was required to present to the trial court the complaint she now

raises on appeal, we hold that Mother has failed to preserve this issue for appellate review. *See* Tex. R. App. P. 33.1(a); *Martinez v. Martinez*, 157 S.W.3d 467, 471 (Tex. App.—Houston [14th Dist.] 2004, no pet.).

We overrule Mother's fourth issue.

## V. Attorney's Fees

In her fifth issue, Mother states that the trial court abused its discretion when it awarded attorney's fees to Father because he neither presented evidence of attorney's fees nor requested an award for attorney's fees. Mother further contends that "the section in the [final] order for the award of amicus fees had been substantially altered"[3] so that "[i]nstead of an award of amicus fees, conforming with the court's ruling, the section was substantially altered and awarded attorney's fees in favor of" Father and against Mother.

Father responds that he did not request an award for attorney's fees he personally incurred in this proceeding, and that the trial court never ordered Mother to pay Father's fees. Father argues that the trial court's order provides for a reimbursement to Father for the payment of Mother's portion of the amicus fees. Mother replies that the record does not support Father's assertion of "reapportionment of amicus fees;" rather, she claims that "what ultimately occurred was nothing other than [Father] impermissibly . . . attempting to award himself of a judgment of attorney's fees against" Mother.

In a suit other than a suit filed by a governmental entity requesting termination of the parent-child relationship or appointment of the entity as conservator of the child, an attorney appointed as an amicus attorney for the child is entitled to reasonable attorney's fees and expenses in an amount set by the court and ordered to be paid by one or more parties to the suit. Tex. Fam. Code Ann. § 107.023 (Vernon 2011). The court may determine that fees awarded to an amicus attorney for the child are necessaries for the benefit of the child. *Id*.

---

[3] In her amended motion for new trial, Mother asserted that the section had been altered without the knowledge or consent of Mother's or Father's counsel.

The trial court's final order does not award attorney's fees that were incurred by the parties during the proceedings. The trial court's Conclusion of Law No. 11 states that "Attorney[' s fees should be ordered to be paid by the party who incurred them to their attorney." Conclusion of Law No. 12 states, "Amicus fees should be paid by 3/1/2011." Under the heading "Amicus Attorney's Fees," the trial court's final order provides as follows:

> IT IS ORDERED that good cause exists to award ~~TERISA TAYLOR BRADY~~ *[Father]*[4] judgment in the amount of $ 5,151.25 for attorney's fees, expenses, and costs incurred by [Mother], with interest at 6 % percent per year compounded annually from the date the judgment is signed until paid. The judgment, for which let execution issue, is awarded against [Mother], Counter-Respondent. IT IS ORDERED that the attorney's fees, expenses, and costs, which were incurred in relation to the child, are in the nature of child support. The Court finds that the fees are necessaries for the benefit of the child, and [Mother] Counter-Respondent is ORDERED to pay the fees, expenses, costs, and interest to ~~TERISA TAYLOR BRADY at 917 Franklin suite 510 Houston Texas 77002~~, *[Father] at . . .* by cash, cashier's check, or money order on or before February 1, 2011. ~~TERISA TAYLOR BRADY~~ *[Father]* may enforce this judgment for fees, expenses, and costs in her own name by any means available for the enforcement of a judgment for debt.

> The Court finds that [Father] has paid ~~his portion of~~ *All* Amicus fees to TERISA TAYLOR BRADY in full as of the entry of this order.

Based on the final order language set forth above, we disagree with Mother's assertion that the trial court awarded Father attorney's fees he incurred during the proceedings. Rather, having determined that Father had paid all of the amicus attorney's fees, the trial court ordered that Father be reimbursed for Mother's portion of the amicus attorney's fees Father paid. We conclude that the trial court did not award Father attorney's fees he incurred during the proceedings.

We overrule Mother's fifth issue.

---

[4] The language added in place of the language struck through is reflected in italics.

## VI.    Motion for New Trial

In her sixth issue, Mother argues that the trial court abused its discretion when it refused to consider her "motion for new trial on new[ly] discovered evidence and substantively altered final order" as a matter of law.

Mother filed an amended motion for new trial on February 25, 2011, in which she alleged that (1) there is newly discovered non-cumulative evidence in the form of two Facebook video postings showing Father has continued consuming alcoholic beverages "since trial and post-rendition" in C.Y.C.'s presence, and this evidence "would most likely result in a different Court ruling;" and (2) "[a]fter the Final Order had been corrected, approved, and filed with the Court, it was altered without the consent or agreement of [Mother's] or [Father's] counsel . . . resulting in an award of attorney's fees in favor of [Father] and against [Mother]."

The trial court held a hearing on Mother's amended motion for new trial on March 9, 2011.  At the hearing, Father argued that, according to Mother's motion, the evidence Mother wanted to present is not newly discovered evidence; instead he argued that it is evidence that did not exist until after the final order was signed.  Mother contended that (1) some of the evidence she wants to present shows events that took place before trial but were posted by Father on facebook post-trial; and (2) other evidence was not in existence until after the final order was signed.

With regard to the issue of "the entry of a substantively altered final order" that resulted in an award of attorney's fees, Mother stated at the hearing that she and Father had "reached an agreement as to the second issue . . . as it pertains to the Amicus fees." Mother told the trial court, "If you deny my Motion for New Trial, then we're just going to strike that entire paragraph as it pertains to Amicus fees."  Taylor confirmed that the issue with regard to her fees was resolved.  The trial court denied Mother's motion for new trial, stating that, if the evidence was not in existence at the time of trial, "then it's not newly discovered evidence from the time period that we're looking at."

28

On appeal, Mother contends that the trial court abused its discretion when it refused to consider her motion for new trial on "the entry of a substantively altered final order." More specifically, Mother asserts that the trial court refused to listen to any evidence and, if the "court had heard the evidence, it probably would have resulted in a different ruling." However, Mother never attempted to offer any evidence at the motion for new trial hearing regarding "the entry of a substantively altered final order" that resulted in an attorney's fees award. As stated above, Mother told the trial court that the parties had reached an agreement regarding the issue, and she made no further argument with respect to the final order and attorney's fees.

We overrule Mother's issue with regard to this argument.

Mother also argues that the trial court abused its discretion when it refused to consider her motion for new trial regarding newly discovered evidence. Mother argues that the newly discovered evidence she wanted to present to the trial court consisted of two Facebook videos, written postings on Facebook, several Facebook postings of photographs, and "statistics of alcohol related injuries and death involving children in the United States." She contends that, "[a]lthough the evidence in question existed at the time of trial, it was not discovered by [her] until after the trial through no fault on her part" and "such evidence was not cumulative and would probably have resulted in the rendition of a different verdict."

A party seeking a new trial on grounds of newly discovered evidence must demonstrate to the trial court that (1) the evidence has come to its knowledge since the trial; (2) its failure to discover the evidence sooner was not due to lack of diligence; (3) the evidence is not cumulative; and (4) the evidence is so material it would probably produce a different result if a new trial were granted. *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 813 (Tex. 2010). Evidence not in existence prior to judgment cannot form the basis of a new trial. *In re S.M.V.*, 287 S.W.3d 435, 451 (Tex. App.—Dallas 2009, no pet.)

Whether a motion for new trial on the ground of newly discovered evidence will

29

be granted or refused is generally addressed to the trial court's sound discretion. *In re A.G.C.*, 279 S.W.3d 441, 453 (Tex. App.—Houston [14th Dist.] 2009, no pet.). However, in matters relating to child custody, it can be error to refuse to grant a motion for new trial — even though the evidence is not newly discovered — when there is an extreme case and the evidence is sufficiently strong. *Id.* (citing *C. v. C.*, 534 S.W.2d 359, 361 (Tex. App.—Dallas 1976, writ dism'd w.o.j.) (trial court abused discretion in overruling motion for new trial where evidence showed father had violent temper and harshly disciplined children)); *In re S.M.V.*, 287 S.W.3d at 451-52 (citing *Hefley v. Hefley*, 859 S.W.2d 120, 125 (Tex. App.—Tyler 1993, no writ) (trial court abused discretion in overruling motion for new trial where evidence showed child was sexually abused by friend of father)).

Here, the record shows that the two Facebook video postings of February 12 and 17, 2011, and the written Facebook posting of February 1, 2011, were not in existence before the trial court signed its final order on January 26, 2011. Therefore, Mother's evidence constitutes new evidence rather than newly discovered evidence; this evidence does not satisfy the burden that must be met to obtain a new trial on the ground of newly discovered evidence. *See In re S.M.V.*, 287 S.W.3d at 452; *Sifuentes v. Tex. Employers' Ins. Ass'n*, 754 S.W.2d 784, 787 (Tex. App.—Dallas 1988, no writ). Further, Mother does not argue, and the record does not show, that the nature of the new evidence in this case is so extreme that the trial court's refusal to hear it constitutes an abuse of discretion. The written posting states: "[Father] likes The Run of The Mill Public House and Brewery."[5] The two videos show Father and C.Y.C. at what looks like an establishment that serves food and beverages. Nothing in the video establishes that Father took C.Y.C. to a bar, as Mother claims in her brief.

With regard to "statistics of alcohol related injuries and death involving children in the United States," Mother has failed to establish that she exercised due diligence to

---

[5] The posting also contains a photo depicting a glass of scotch on the Facebook page of a man named Michael Kaplan with Father's comment "A nice cigar would go well with that Michael!!!" The posting is dated February 26, but no year is reflected.

discover this evidence. Mother also failed to present any evidence that she exercised due diligence to discover two written Facebook postings of August 9, 2010.

Mother further points to six photo and comment postings under the title "Guys Trip Maine 2009." These photos and comments were posted on December 3, 2010 — after the trial, but before the final order was signed. The posted photos depict different men, including Father; the comments accompanying the photos state: "She can rock;" "Uncle Tom and I ordering drinks for the umpteenth time;" "Hammered Dinner;" "Our Condo. We got the side where sun shines at 6[:]00am. But hey, we didn't go there to sleep. We came to Party;" "Narcissistic? Maybe. Wasted? Absolutely!!;" and "Hah, and theres [sic] the Uncle.[6] Passing out with style."

Mother contends that, "[i]f true, this newly discovered evidence would show that [Father] perjured himself and lied to the court" when he testified that he is a "recovered alcoholic and has stopped drinking." Mother contends Father was "continuing to become intoxicated or consuming alcohol" while he was on a trip to Maine with C.Y.C. Mother contends that evidence of alcohol consumption during this Maine trip was not cumulative, and would have "probably resulted in the rendition of a different verdict."

Mother asserts that these six postings relate to a trip Father took with C.Y.C. to Maine in August 2010. The postings are entitled "Guys Trip — Maine 2009." These postings of a 2009 Maine trip cannot show that Father was consuming alcohol on a trip he took with C.Y.C. to Maine in 2010. Further, considering that this "Guys Trip" of 2009 occurred before the bench trial in November 2009 and August to September 2010, at which the trial court heard substantial evidence about how much alcohol Father consumed, Father's blackouts, and Father's highly inappropriate drunk behavior, Mother cannot establish that the evidence of these six postings is not cumulative and is "so material that it would probably produce a different verdict."

We conclude that the trial court did not abuse its discretion in denying Mother's

---

[6] "Uncle" is referring to Father.

motion for new trial based on newly discovered evidence. Accordingly, Mother's sixth issue is overruled.

## Conclusion

The trial court's judgment is affirmed.


/s/     William J. Boyce
Justice


Panel consists of Justices Seymore, Boyce, and Mirabal.[7]

---

[7] Senior Justice Margaret Garner Mirabal sitting by assignment.