

# NUMBER 13-21-00457-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

## IN INTEREST OF D.T., A CHILD

---

### On appeal from the 343rd District Court
### of San Patricio County, Texas.

---

## MEMORANDUM OPINION

**Before Justices Tijerina, Silva, and Peña**
**Memorandum Opinion by Justice Tijerina**

In this suit affecting the parent-child relationship (SAPCR), the trial court awarded appellee Mother the person with the exclusive right to designate the primary residence of her child D.T.[1] By three issues, appellant Father argues that the trial court abused its discretion by: (1) awarding Mother the person with the exclusive right to designate the

---

[1] For the child's privacy, we refer to the child by an alias and family members by their relationships to the child. *See* TEX. R. APP. P. 9.8; *see also* TEX. FAM. CODE ANN. § 109.002(d).

primary residence; (2) improperly tasking an amicus attorney with duties of a "child custody evaluator"; and (3) denying him a fair trial. We affirm.

## I. BACKGROUND

On June 4, 2019, Father filed the original SAPCR requesting that he and Mother be appointed joint managing conservators, that he be designated the person with the exclusive right to designate the primary residence of D.T., and that the trial court order Mother to pay child support. Mother responded, requesting an order of paternity, that she be appointed sole managing conservator, that she be designated with the exclusive right to designate the primary residence of D.T., and that the trial court order Father to pay child support. The trial court issued several temporary orders, rendering 14-day alternating possession periods.

On March 31, 2020, the trial court signed an agreed order appointing an amicus attorney. On April 2, 2020, Father filed several motions: for a child custody evaluation, to compel discovery, for sanctions, for modification of the temporary orders, and for a mental health examination of Mother.

The next day, Mother filed a petition for writ of habeas corpus and writ of attachment, claiming that Father was illegally restraining D.T. from Mother's possession and was threatening D.T.'s "physical and emotional well-being because [Father was] establishing and encouraging parental alienation between [D.T.] and her mother." Mother subsequently filed a motion for child custody evaluation, a motion for mental health examination, and a motion for modification of the temporary orders.

2

On April 17, 2020, Father submitted a request for a new parenting facilitator. According to Father, their current parenting facilitator was "rude, argumentative, [and] belittling." Father requested the services of Kate Rodriguez, PhD, LPC-S—a licensed professional counselor-supervisor. On May 12, 2020, the trial court signed an agreed order appointing Dr. Rodriguez.

Father and Mother filed several motions for enforcement and motions to modify temporary orders. On December 11, 2020, Father filed a motion for alcohol screening, alleging Mother was an active alcohol drinker. Father further filed a motion to compel discovery and for sanctions on December 18, 2020. Mother responded by filing another petition for writ of habeas corpus and writ of attachment on December 28, 2020, alleging Father was denying Mother access to D.T.

On January 19, 2021, Dr. Rodriguez filed her report as parenting facilitator. In her report, Dr. Rodriguez stated that Mother has never missed a session with Dr. Rodriguez while Father cancelled two sessions and did not attend two other sessions. According to Dr. Rodriguez, Father stopped communicating with her in August 2020 until the trial court prompted him to continue with parent facilitation. In the following session, Dr. Rodriguez informed Father that his messages on Our Family Wizard to Mother appear "very hostile."[2] Father explained that he would not change his communication patterns with Mother.

In her report, Dr. Rodriguez further stated that Father accused Mother of alcohol abuse, having unfit boyfriends, and lying, noting that Father "has admitted to having

---

[2] Our Family Wizard is a "co-parenting" application for families living separately that is monitored by the court system.

various private investigators and friends follow" Mother. Father informed Dr. Rodriguez that he has Mother followed even when she is not in possession of D.T.[3] Dr. Rodriguez stated that Father accuses Mother of "delusions and paranoia" when Mother reports feeling like she is being followed, even suggesting that Mother needed a psychological evaluation. Dr. Rodriguez stated that Father "has made it clear that his goal is to catch [Mother] in lies in order to obtain full custody of [D.T.]."

Dr. Rodriguez was concerned about Father's constant harassment of Mother and Mother's consequential unwillingness to communicate with Father. If Mother did not respond to Father immediately, Father repeatedly called and texted her. As a result, Mother blocked Father from all communication except on Our Family Wizard. Dr. Rodriguez stated that Father continued to harass Mother in "demeaning, controlling, and threatening" ways.

In their joint sessions, Father "attempted to dominate" the sessions and would not allow Mother to respond to his accusations. Dr. Rodriguez testified that she tried to stop Father from preventing Mother from speaking; however, Father yelled at Dr. Rodriguez accusing her of being on Mother's side and said that it was the "women against" him again. Father reportedly refused to let Mother speak, claiming, "all [Mother] does is lie!" Because Father continually displayed hostility toward Mother and declined to stop that behavior, Dr. Rodriguez believed he "ha[d] made it clear that he does not want to work

---

[3] Father's private investigator (PI) shared pictures of Mother with her male boss and vendors. Father began calling Mother at her employment and accused her of having affairs.

on co-parenting, communication, or change any of his current behaviors." Consequently, Dr. Rodriguez ceased future sessions as they would not be beneficial.

Dr. Rodriguez believed that Father's behavior indicated that he was not concerned about what was best for D.T. In her professional opinion, she suggested that he have a psychological evaluation due to his behaviors, intense anger, and stalking. Dr. Rodriguez indicated that Father was unreasonable, even demanding that Dr. Rodriguez give him her notes so that he could correct them because, although he had never seen them before, he "knows" they contained false information. Additionally, Dr. Rodriguez shared that Father recorded Dr. Rodriguez without her consent. Thus, Dr. Rodriguez no longer felt comfortable continuing with future sessions until Father sought psychological evaluation.

On July 26, 2021, Father filed another motion to modify temporary orders, stating that the present orders were no longer in the best interest of D.T. because Mother consumed alcohol during her period of possession and moved D.T. "to a place that is not suitable for young children." In the motion, Father sought to be appointed sole managing conservator and that Mother be given a standard possession order.

On August 4, 2021, Father filed a motion for enforcement of injunction and order to appear, asserting that his private investigator (PI) revealed that Mother was "drinking beer" at her friend's house. Father attached his PI's affidavit, which allegedly confirmed that Mother was drinking on June 26, 2021, July 20, 2021, and July 27, 2021. Father filed another motion for enforcement of possession or access and order to appear, asserting that Mother did not make D.T. available for Facetime on at least four occasions. Father requested that Mother be held in criminal contempt, jailed for up to 180 days for each

violation, fined in the amount of $500 for each violation, and placed on community supervision for a period of ten years.

The trial court held a final hearing on October 28, 2021. At the hearing, Mother testified that she then-resided in Port Mansfield, and she lived in a home with her stepfather and D.T.

Mother further testified that she was then-employed as a manager at a restaurant, and she also ran a catering business on the side. Prior to her employment as manager, she testified to her previous employment history as follows: (1) she was employed at another restaurant, but she had to cease employment because it interfered with her catering business; (2) she worked at Port Mansfield Club for three weeks, but her position was temporary to help renovate the establishment after a hurricane and freeze; (3) she worked in Austin as an event manager, but it only lasted five months due to COVID; (4) she worked at a retirement home previously, but she stopped working there to become the event manager in Austin; and (5) she worked for Amazon prior to working at the retirement home.

In a two-and-a-half-year period (since the inception of this case), Mother stated that she has had three boyfriends, but D.T. only met one. Mother admitted that she "might have had a beer or two" in violation of the court's temporary order during the periods of possession of D.T.

Mother stated that Father rents cars to stalk her, takes pictures of her, constantly harasses her, and tracks her. "It never stops," she said. Mother stated that she is fearful of Father; he has showed up to her employment "probably three times" and jeopardized

6

her employment. She explained that Father has not changed his co-parenting, even after using the parenting facilitators. Father sends her "about 20 messages a day still[;] . . . one minute [she is] trash and the next minute [Father] loves [her] and he wants [her] to come home. It never stops."

Father testified that he lives in a home with his son and D.T.[4] He admitted he initiates communication with Mother daily, even on days that he has possession of D.T. because he feels like Mother is dishonest with him. Father stated that Mother is a good parent, but his primary concern is that Mother drinks and drives with D.T., which he learned from his PI. According to Father, he is concerned with Mother not being truthful to him. For this reason, he has hired two PIs. Father admitted the PIs have followed Mother even when she is not in possession of D.T.

Father informed the court that his home is better for D.T. because it is stable; D.T. would be in the same bed every night; D.T. would follow the same structure; and D.T. would reside with her half-brother. He stated that when he has D.T., he takes an entire week at a time off work.

The amicus attorney asked Father whether he could allow Mother to parent during her week without Father interfering and sending Mother messages:

[Amicus]: [I]f that was an injunction in saying that you're going to have to trust the good Lord and the mother that she is going to care for [D.T.] during that time and she likewise is going to have to trust that you're going to do the right thing for [D.T.] during the time you have her, and unless there is an emergency, y'all aren't going to communicate, is that a possibility with you?

---

[4] Father explained that his son had not seen his biological mother in over eleven years. According to Father, his son's biological mother suffered from substance abuse.

[Father]:     Yeah, I could not text her. But do I believe that? No. I mean, just because I know.

The PI testified that on at least three occasions, he followed Mother and observed her at her friends' get-togethers. It appeared to him that Mother was drinking because there was alcohol and cigarettes within her possession and directly in front of her. On at least two of those occasions, he stated that he saw D.T. with Mother at the get-togethers.

N.S., Mother's mother, testified that Mother was a great parent. N.S. further stated that Father harassed N.S. by calling her, texting her, and messaging her on Facebook, such that Mother blocked Father from all communication. N.S. stated that Mother was not an alcoholic and had never seen Mother display inappropriate behavior. Specifically, N.S. stated that Mother has never acted inappropriately in front of D.T.

The amicus attorney testified that the problem here is "an absolute dysfunctional co-parenting." The amicus attorney opined that Father should not have the exclusive right to designate primary residence of D.T. because in her opinion he uses this power as a weapon sometimes.

At the conclusion of the hearing, the trial court appointed Father and Mother joint managing conservators. The trial court awarded Mother the person with the exclusive right to designate the primary residence of D.T. and stated, "I don't know how long she is going [to] stay with you, [Mother], because I don't know that you'll be able to hold it together because you are on a thin line in my opinion . . . . [I]f not I know [Father] can do a great job with that." Father filed a motion for reconsideration on November 18, 2021, requesting that the trial court award Father and Mother a one "week-on, week-off," possession schedule.

8

On December 2, 2021, the trial court issued its final order in accordance with its ruling on October 28, 2021, appointing Father and Mother joint managing conservators and appointing Mother the person with the exclusive right to designate the primary residence of D.T. Father appealed.

## II. STANDARD OF REVIEW

In determining issues of conservatorship and possession and access, the primary consideration is always the best interests of the child. *See* TEX. FAM. CODE ANN. § 153.002; *Lenz v. Lenz*, 79 S.W.3d 10, 14 (Tex. 2002). We review a trial court's decision to modify an order regarding conservatorship or the terms of possession of and access to a child under an abuse of discretion. *See Baltzer v. Medina*, 240 S.W.3d 469, 474–75 (Tex. App.—Houston [14th Dist.] 2007, no pet.). A trial court abuses its discretion if it acts arbitrarily, unreasonably, or without reference to any guiding rules or principles. *See Flowers v. Flowers*, 407 S.W.3d 452, 457 (Tex. App.—Houston [14th Dist.] 2013, no pet.). "Under an abuse-of-discretion standard, legal and factual insufficiency are not independent grounds of error." *Id.* Rather, they "are relevant factors in assessing whether the trial court abused its discretion." *Id.* "There is no abuse of discretion as long as some evidence of a substantive and probative character exists to support the trial court's" exercise of its discretion. *Id.*

## III. EXCLUSIVE RIGHT TO DETERMINE PRIMARY RESIDENCE

By his first issue, Father argues that the trial court abused its discretion by granting Mother the person with the exclusive right to determine D.T.'s residence. Specifically,

9

Father argues the trial court supported its verdict with hearsay evidence.[5] Without getting into the merits of this issue and without considering the complained-of evidence, we look to other evidence before the trial court—notwithstanding Father's hearsay objection—to determine whether the trial court abused its discretion by granting Mother the person with the exclusive right to determine D.T.'s residence.

## A.    Applicable Law

The best interest of the child is of paramount importance in making any custody determination. *See* TEX. FAM. CODE ANN. § 153.002; *In re V.L.K.*, 24 S.W.3d 338, 342 (Tex. 2000). A court may use the following non-exhaustive list of factors to determine the child's best interests: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by the individuals seeking custody; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions of the parent.

---

[5] Father complains the following evidence constitutes hearsay. Father admitted that he has three Facebook profiles under the name S.E. Although he regularly messaged his ex-wife on Facebook, Father did not consider electronic communication as a form of harassment. The trial court asked, "I know you haven't talked to [your ex-wife], but have you ever thought that maybe your messaging or electronic communication [on Facebook] may be seemed as harassing to [your ex-wife]? Have you ever thought about that?" Father responded, "No." The trial court replied, "Okay. I [know] that was the answer[] because he doesn't think that. That is part of our problem."

At the conclusion of the hearing, the trial court stated that it was going to "place D.T. with the parent I feel like that will facilitate the relationship with the other [parent,] and that is [Mother]." The trial court explained that Father "has done it with [his ex-wife]. He doesn't facilitate. As a parent you've got to make it happen. That is just how I feel about it."

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002) (providing that proof of the best interest of a child is not limited to the *Holley* factors, nor do all the factors apply in every case).

## B.    Discussion

In challenging the trial court's order granting Mother the person with the exclusive right to determine D.T.'s primary residence, Father points to Mother having moved seven different times over a two-and-a-half-year period, holding multiple jobs for less than six months, having different "boyfriends," and violating the trial court's order by not providing the amicus attorney with the names of D.T.'s caretakers and drinking alcohol while in possession of D.T.

Mother explained that she was living in Port Mansfield prior to her involvement with Father and owned a catering business there for at least twelve years. She and D.T. subsequently moved to Austin with N.S. when Mother's relationship with Father ended. The trial court inquired what Mother's long-term plans were as far as living arrangements. Mother stated that her stepfather is battling stage four cancer and is currently in hospice care. According to Mother, the home she currently lives in will be split between her stepfather's children, including her. "[W]e have already all agreed that after he passes— and we all get along . . . that [D.T.] and I can stay there. [The other children] live elsewhere . . . . [D.T.] and I are welcome to stay in the house," and it would be Mother's responsibility to maintain the house, but taxes and insurance would be split among all of stepfather's children. Mother explained that D.T. was already enrolled in a relatively small school.

11

Father informed the trial court that Mother "is a good mother," but "she just does certain things that worry" him like drinking and driving. However, Mother denied drinking and driving with D.T. During a two-and-a-half-year period, Mother has had "one or two beers" while D.T. was in her possession. Mother was then presented with photos of her at friends' gatherings with alcohol in front of her, but Mother denied that she was drinking on those occasions. In fact, Mother stated that D.T. did not even attend one of those get-togethers. Regarding Father's allegations about Mother's boyfriends, Mother stated that D.T. only met one person.

N.S. testified that Mother "is a great mom, very caring, loving, concerned over anything that might come up." N.S. stated there were no concerning behaviors of Mother. The amicus attorney testified that she has seen Mother's home: "There is a bed, there [are] toys, and there is everything there for the young girl."

On the other hand, Dr. Rodriguez, Mother, N.S., the amicus attorney, and Father elucidated Father's concerning behavior as it related to his ability to coparent. Mother stated that Father stalks her, takes pictures of her, and that she is the subject of constant harassment. Father testified that although Mother is not receptive to having conversations with him, he continues to message her *daily* "[b]ecause it has got [to] change sooner or later to get along or something." N.S. stated that Father harassed her, causing her to block him from her phone and on social media. Dr. Rodriguez stated that she felt threatened by Father, refused to continue her role as parenting facilitator, and discontinued her services. Dr. Rodriguez further opined that Father was not interested in what was best for D.T., he was not interested in becoming a better parent, and he

12

continued to be hostile with Mother. When the amicus attorney questioned whether Father could refrain from messaging Mother daily for the sake of co-parenting and allow Mother to parent, Father stated he did not believe that he could.

The trial court was in the best position to observe the demeanor and personalities of the witnesses, and we defer to the trial court's determinations regarding the credibility of the witnesses. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). We can infer the trial court credited Mother's testimony, and we conclude that there is some evidence of a substantial and probative character to support the trial court's decision that it was in the best interest of D.T. to appoint Mother the person with the exclusive right to designate D.T.'s primary residence. *See Flowers*, 407 S.W.3d at 459; *In re K.L.W.*, 301 S.W.3d 423, 428 (Tex. App.—Dallas 2009, no pet.) ("In determining which conservator will have exclusive right to establish primary residence under [§] 153.134(b), the trial court is vested with broad discretion."). We therefore find no abuse of discretion. *See Flowers*, 407 S.W.3d at 459. We overrule Father's first issue.

## IV.  AMICUS ATTORNEY

By his second issue, Father argues that "the trial court abused its discretion when it tasked [the amicus attorney] with duties that qualified her as a child custody evaluator." Father does not elaborate what specific duties the trial court tasked the amicus attorney to perform that are objectionable, and Father concedes that "the order is silent."

To present a complaint for appellate review, the record must show that (1) the complaint was presented to the trial court by a timely request, objection, or motion stating the specific grounds for the desired ruling if the specific grounds are not apparent from

13

the context and (2) the trial court ruled on the request. TEX. R. APP. P. 33.1(a); *Bush v. Bush*, 336 S.W.3d 722, 729 (Tex. App.—Houston [1st Dist.] 2010, no pet.). To be considered timely, the request, objection, or motion generally must be made at the earliest possible opportunity, thereby allowing the trial court an opportunity to cure the error. *See Lake v. Premier Transp.*, 246 S.W.3d 167, 174 (Tex. App.—Tyler 2007, no pet.).

Here, the trial court entered an agreed order appointing the amicus attorney on March 31, 2020, "to assist the Court in protecting the best interest of" D.T., to "take any action consistent with the child's interests that [the amicus attorney] considers necessary to expedite the proceedings," and to "advocate the best interests of the child after reviewing the facts and circumstances of the case." *See* TEX. FAM. CODE ANN. § 107.001(1) (providing that an "amicus attorney" is "an attorney appointed by the court in a suit, other than a suit filed by a governmental entity, whose role is to provide legal services necessary to assist the court in protecting a child's best interests rather than to provide legal services to the child"). The trial court specifically tasked the amicus attorney with the duties as outlined in §§ 107.003 and 107.005. *See id.* §§ 107.003 ("Powers and Duties of Attorney ad Litem for Child and Amicus Attorney"), 107.005 ("Additional Duties of Amicus Attorney"). The amicus attorney appeared throughout this case. *See O'Connor v. O'Connor*, 245 S.W.3d 511, 515 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (providing that the amicus attorney is appointed to assist the court; it is not to represent the child or either of the parents). Father did not object or file any motions to disqualify the amicus attorney based on her alleged role as child custody evaluator.[6] *See Gabel v.*

---

[6] In fact, Father filed a motion requesting that the trial court appoint a child custody evaluator on

*Gabel-Koehne*, 649 S.W.3d 590, 603 (Tex. App.—Houston [1st Dist.] 2022, no pet.) ("Because Haden did not raise his objection until after the final hearing had occurred and the amicus attorney had already completed her work on the case, the objection was not timely."). At trial, the amicus attorney testified without objection. *See id.* Furthermore, Father did not file any post-judgment motion complaining of the amicus attorney's alleged dual role. *See Bush*, 336 S.W.3d at 729 (holding that an objection to the scope of amicus attorney's appointment made in a motion for new trial failed to preserve complaint for appeal). Therefore, this issue has not been properly preserved for appeal. *See id.* ("Even if we were to take Tracy's argument in her motion for new trial as an objection to the trial court's appointment of the amicus attorney in a limited scope, this objection came over a year and a half after the trial court appointed the amicus attorney with those limitations specifically stated without any objection."). We overrule his second issue.

## V. FAIR AND IMPARTIAL TRIAL

By his third issue, Father argues that the trial court denied him "a fair trial when it did not allow [him] to present a defense and by the Court's deep-seated antagonism toward [him]."

### A. Applicable Law

Due process requires a neutral and detached judge. *See Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973); *Ellason v. Ellason*, 162 S.W.3d 883, 887 (Tex. App.—Dallas 2005, no pet.) (providing that the parties have a right to a fair trial before an impartial judge). We presume the trial judge was neutral and detached "in the absence of a clear showing

---

April 1, 2020.

15

to the contrary." *Earley v. State*, 855 S.W.2d 260, 262 (Tex. App.—Corpus Christi–Edinburg 1993)*, pet. dism'd*, *improvidently granted*, 855 S.W.2d 260 (Tex. Crim App. 1994). The opinions a judge forms during a trial do not call into question a judge's bias or partiality "unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994). A judge's criticism, disapproval of, or even hostility towards counsel, the parties, or their cases are not behaviors that do not ordinarily support a bias or partiality challenge. *Id.* "[E]xpressions of impatience, dissatisfaction, annoyance, and even anger," do not establish bias or partiality. *Id.* at 555–56. "A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." *Id.* at 556.

The trial court has broad discretion over the conduct of a trial and may properly intervene to maintain control in the courtroom, to expedite the trial, and to prevent what it considers to be a waste of time. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 240 (Tex. 2001) (per curiam). The trial judge has a duty to direct competent and material questions to a witness to clarify testimony or to elicit testimony that has not otherwise been brought out, and such practice is especially proper in a bench trial where the best interests of children are at issue. *Sklar v. Sklar*, 598 S.W.3d 810, 825 (Tex. App.—Houston [14th Dist.] 2020, no pet.); *see also In re A.T.M.*, No. 13-21-00008-CV, 2021 WL 2584402, at *17 (Tex., App.—Corpus Christi–Edinburg June 24, 2021, no pet.) (mem. op.) (citing *Trahan v. Trahan*, 732 S.W.2d 113, 114–15 (Tex. App.—Beaumont 1987, no writ))

(holding the right to an impartial judge was not violated where the trial court asked more questions than either of the attorneys)).

## B.   Discussion

Father complains for the first time on appeal of statements that occurred at a writ of attachment hearing on January 15, 2021. Father cites instances where he alleges that the trial court interrupted him, prohibited him from elaborating or from "present[ing] his side," and referenced Dr. Rodriguez's report, which Father asserts is an "outside report." However, no objection was made to these exchanges. *See* TEX. R. APP. P. 33.1(a); *In re L.M.I.*, 119 S.W.3d 707, 708 (Tex. 2003) ("[A]dhering to our preservation rules [in a parental termination case] isn't a mere technical nicety; the interests at stake are too important to relax rules that serve a critical purpose."); *In re A.L.E.*, 279 S.W.3d 424, 431 (Tex. App.—Houston [14th Dist.] 2009, no pet.) ("Requiring parties to preserve their complaints in family-law cases furthers the legislative intent that such cases be resolved expeditiously and with finality.").

Additionally, Father alleges that the trial court denied him an opening statement and demonstrated "deep[-]seated antagonism" toward him when it asked Mother whether Father was still "hypervigilant" at the final hearing. However, Father did not request an opportunity to make an opening statement, and he did not object to the trial court's inquiry. *See* TEX. R. APP. P. 33.1(a); *In re L.M.I.*, 119 S.W.3d at 708; *see also In re of A.C.R.*, No. 11-22-00358-CV, 2023 WL 3872722, at *5 (Tex. App.—Eastland June 8, 2023, no pet.) (holding that appellant waived a complaint that the trial court erred by not allowing him an opportunity to make an opening statement at a bench trial where appellant did not request

17

an opportunity to make an opening statement); *In re G.M.K.*, No. 13-22-00016-CV, 2023 WL 5122524, at *6 (Tex. App.—Corpus Christi–Edinburg Aug. 10, 2023, no pet.) ("Jared failed to object to the trial court's comments or questions and does not attempt to argue why they were incurable or would excuse his failure to preserve error," and "does not argue that preservation was unnecessary because the error was fundamental.").

After considering the entire record, we cannot conclude that the trial court demonstrated a "deep-seated favoritism or antagonism that would make fair judgment impossible." *See Liteky*, 510 U.S. at 555. Father's complaints involve the trial court's skepticism as to Father's behavior and his unwillingness to change his co-parenting habits.[7] The trial court's statements about Father concern "routine trial administration efforts," "ordinary admonishments (whether or not legally supportable) to counsel," "and all occurred in the course of judicial proceedings, and n[one] . . . displayed deep-seated [nor] unequivocal antagonism that would render [a] fair judgment impossible." *Id.* at 556. In fact, the trial court acknowledged, "[Father] is the best father in the entire world. It's how he handles the relationship with [Mother] that is the causing the problems." The trial court stated that it wanted Father "to have time with his child. He loves his child. He's not a bad parent. He just cannot co-parent. And until he learns to co-parent, his time is going

---

[7] In the complained-of exchanges, the trial court stated that "whenever a parent starts controlling—trying to control the other by keeping a child from a parent, that is a no-no in my court, [Father]." The trial court stated that it was "not going to put up with it" and was "irritated in this case" when it saw how the parties treated each other. "And that's my number one pet peeve," it explained. The trial court elaborated that it had "severe concerns of allowing [Father] to have the child for a[]while." The trial court continued: "[Father] is overprotecting. He's going to have to learn to ratchet that back. And me giving him an order that he doesn't get to see his kid isn't going to help that. He needs to have counseling and he needs to address those issues." The trial court further explained that Father needed to learn to put his fears in a healthy perspective.

18

to be limited to this child. I cannot have this happening. It's detrimental to that child[,] and she is my number one interest."[8]

Lastly, Father complains the trial court modified its temporary order "unilaterally." However, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Id.* at 555. After applying the applicable principles to this case and carefully examining the trial court's comments and allegedly extrajudicial consideration in the context of the entire record, we conclude there is no evidence of judicial bias. *Id.* Instead, the trial court exercised its broad discretion to maintain control over highly emotional and contentious proceedings. *See id.* Accordingly, we overrule Father's last issue.

## VI.    CONCLUSION

We affirm the judgment of the trial court.

JAIME TIJERINA
Justice

Delivered and filed on the
21st day of September, 2023.

---

[8] We note that during this exchange, Father interrupted the trial court and the amicus attorney, and Father's counsel stated, "[Father,] if you could be quiet, that would be great."